UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,        :

                                        :

                                        :

          v.                     :     CRIMINAL NO. 14-409 (HB)

                                        :

CHAKA FATTAH, JR.           :

## **MOTION TO QUASH THE INDICTMENT WITH PREJUDICE FOR PERJURY BEFORE THE GRAND JURY AND DUE TO REPEATED AND INTENTIONAL GOVERNMENT MISCONDUCT**

Defendant Chaka Fattah, Jr., hereby files a Motion to Quash the Indictment with Prejudice for Perjury Before the Grand Jury and Due to Repeated and Intentional Government Misconduct. Defendant Fattah's motion is based upon the accompanying memorandum of points and authorities, the attached exhibits, other records in this case and Mr. Amato's case, and the arguments and evidence presented at or before the hearing on this Motion.

Respectfully submitted, this 10th day of December, 2014.

                                                    CHAKA FATTAH, JR., PRO SE
                                                       5783 Nassau Road
                                                   Philadelphia, PA 19131
                                                Phone: 215-301-8125
                                            Email: cfattahjr@gmail.com

## TABLE OF CONTENTS

A.  INTRODUCTION AND LEGAL STANDARD……………………………………………4

B.  THE VIOLATIONS OF THE DEFENDANT'S RIGHT TO DUE PROCESS WARRANT DISMISSAL OF THE INDICTMENT. DISMISSAL IS ALSO WARRANTED UNDER THE COURT'S SUPERVISORY POWERS…..…………………………………....11

    A.  Mr. Amato and FBI Agent Haag Falsely Testified About Income and Expenses Related to Fattah's 2004 Tax Return, Working Capital, Fattah's 2004 Revenue and Counts 1-7……………………………………………………….……..…11

    B.  Mr. Amato Falsely Testified That Chaka Fattah Jr. & Associates Did Not Exist, In Violation of 18 U.S.C. § 1623…..………………………………………………28

    C.  Mr. Amato Falsely Testified That He Never Held A Management Position or Ownership With CFJA or Fattah Related Entity…………………………….…31

    D.  The United States Has Made False Representations To This Court Related to Mr. Amato and Fattah……..……………………………………………………..…34

    E.  The Search Warrant Affidavit Contained False, Conclusory Allegations, Related to Mr. Amato and Fattah. The Fabrication of Evidence Violated Due Process……..…39

    F.  Mr. Braxton's Grand Jury Testimony Contained False Declarations, In Violation of 18 U.S.C. § 1623……………………………………………………………42

    G.  FBI Agent Haag and School District Attorney Mr. McCarthy's Grand Jury Testimony Contained False Declarations, In Violation of 18 U.S.C. § 1623……………………59

    H.  The United States Violated Fattah's Right to Due Process and Improperly Mixed Two Purported Parallel Investigations By The Philadelphia School District and the Small Business Administration To Obtain Evidence For This Criminal Proceeding Based On the Same Facts……………………………………………………………..…71

    I.  The United States Improperly Reviewed Email Communications Between Fattah and Former Defense Lawyers……………………………………………………85

J.   The United States Has Violated Fed.R.Crim.P. 6(e) on Grand Jury Secrecy and Damaged Fattah's Reputation in 2012. Further, the United States Improperly Contacted An Attorney To Interfere With Fattah Right to a Trial by Jury…………..85

K.   False Statements and Material Omissions in the February 2012 Search Warrant Affidavit. Further, the Search Warrant Was A "General Warrant"………………..98

C.   GENERAL PRINCIPLES GOVERNING PROSECUTORIAL CONDUCT   ………..108

D.   THE INDICTMENT SHOULD BE DISMISSED WITH PREJUDICE ..………...…110

E.   CONCLUSION……………………………………………………………………113

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,        :

                                 :

                                 :

             v.                  :     CRIMINAL NO. 14-409 (HB)

                                 :

CHAKA FATTAH, JR.                :


**MEMORANDUM OF POINTS AND AUTHORITIES**

**A.  Introduction & Legal Standard**

Defendant, Chaka Fattah, Jr., requests that this Court dismiss the Indictment, or

Counts 1-7, 12 and 19-23, for perjury before the grand jury, prosecutorial misconduct related

to that testimony, and the resulting prejudice. The United States has made several

misrepresentations to this Court as it relates to Mr. Amato, going back to February 2012. The

United States also failed to notify the Court, the grand jury, or Fattah's previous counsel

about the perjury before the grand jury on material matters. Matthew Amato perjured himself

in testimony before the grand jury on May 28, 2013. Mr. Amato and Agent Haag's testimony

were critical in securing the Indictment in this matter as it relates to Counts 1-7. Mr. Amato,

Anthony Braxton, Paul McCarthy and Agent Haag's testimony may have had an even greater

impact on the other counts of the Indictment. Assuming the grand jury believed Mr. Amato,

Agent Haag and Mr. Braxton, it would have been easier to believe Fattah made other false

statements. Mr. McCarthy, an attorney for the Philadelphia School District gave false

4

testimony related to Counts 19-21. Agent Haag gave false testimony, in part, about Counts 19-23. Further, the testimony of Mr. Amato, Mr. Braxton, Mr. McCarthy and Agent Haag was prejudicial to Fattah's detriment, and the prosecutors knew, or should have known about it. A portion of the questions and answers related to Mr. Amato, Mr. Braxton and Agent Haag show a reckless disregard for the facts. The questions, many of them leading, expose exactly the testimony that prosecutors wanted before the grand jury. Further, false testimony by a government agent also helped prosecutors secure the Indictment as it relates to counts 1-7, 12 and 19-23. The prosecutors failed to correct statements by Mr. Amato which they knew were inconsistent with previous sworn testimony, IRS documents, interviews with government agents and other government evidence in the investigation leading to the Indictment. The prosecutors also failed to correct false statements by FBI Agent Haag related to the same counts. The prosecutors had Mr. Amato's testimony for nearly 15 months prior to the return of the Indictment, so there can be no dispute that they knew what was in it. In United States v. Samango, 607 F.2d 883, the Ninth Circuit said the "[grand jury] transcript consisted of testimony given nearly two years earlier . . .Since his testimony was in written form, the prosecutor knew before he presented it exactly what it contained." ("If evidence exists . . . which casts serious doubt on the credibility of testimony which the jurors are asked to rely upon in finding an indictment, the prosecutor has an ethical duty to bring it to their attention." Id. at 877, 884 n.8).

Anthony Braxton, speaking as the former senior lending officer at United Bank, gave perjured and misleading testimony on June 25, 2013 which resulted in the present Indictment

as it relates to count 12. Fattah does not make this accusation lightly and that assertion is fully supported by this filing and exhibits referenced herein.

The United States also failed to inform this Court, the grand jury, and Fattah's previous counsel in this matter as it relates to the false declarations before the grand jury. In United States v. Basurto, 497 F.2d 781 (9th Cir. 1974), the Ninth Circuit said "[a]t the point at which he learned of the perjury before the grand jury, the prosecuting attorney was under a duty to notify the court and the grand jury, to correct the cancer of justice that had become apparent to him. To permit the appellants to stand trial when the prosecutor knew of the perjury before the grand jury only allowed the cancer to grow." Further, the Ninth Circuit said in Basurto: "[w]e hold that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel— and, if the perjury may be material, also the grand jury— in order that appropriate action may be taken. We base our decision on a long line of cases which recognize the existence of a duty of good faith on the part of the prosecutor with respect to the court, the grand jury, and the defendant. While the facts of these cases may not exactly parallel those of the instant case, we hold that their rulings regarding the consequences of a violation of abuse of his prosecutorial duty must be applied where the prosecutor has knowledge that testimony before the grand jury was perjured." (citing Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 70 L.Ed. 791 (1935); Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Napue v. Illinois, 360

6

U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); <u>Alcorta v. Texas</u>, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); <u>Hysler v. Florida</u>, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 392 (1942); <u>Pyle v. Kansas</u>, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942)). Fattah submits the Due Process Clause of the Fifth Amendment would be violated by proceeding to trial on the present Indictment, secured with perjured testimony. ("An indictment cannot be based on perjured testimony, and the government may not use perjured testimony at trial if there is a reasonable chance that it would affect the jury's judgment[,]") (<u>United States v. Vallie</u>, 284 F.3d 917, 921 (8th Cir. 2000); ("The government's knowing use of false testimony violates due process") (<u>United States v. Useni</u>, 516 F.3d 634, 656 (7th Cir. 2008)) (citing <u>United States v. Burke</u>, 425 F.3d 412 (7th Cir. 2005)); ("…there remain certain limitations on the presentations that a prosecutor may make to the grand jury" <u>United States v. Hogan</u>, 712 F.2d 757 (2d Cir. 1983) (citing <u>United States v. Ciambrone</u>, 601 F.2d 616, 623 (2d Cir 1979) (prosecutor may not mislead grand jury or engage in fundamentally unfair tactics before it). As Justice Brandeis has said "[t]he greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." <u>Olmsted v. United States</u>, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928). "It is the duty of a prosecutor presenting a case to a Grand Jury not to inflame or otherwise improperly influence the jurors against any person". <u>United States v. DiGrazia</u>, 213 F.Supp. 232 (N.D. Ill. 1963). The accused has a right "to have the grand jury make the charge on its own judgment." <u>Stirone v. United States</u>, 361 U.S. 212, 219, 80 S.Ct. 274, 4 L.Ed.2d.

The Third Circuit has noted that "[i]n federal criminal proceedings, the right to indictment by an unbiased grand jury is guaranteed by the fifth amendment." <u>United States v.</u>

Serubo, 604 F.2d 807 (citing Costello v. United States, 350 U.S. 359 (1956) "When the framers of the Bill of Rights placed that requirement in the fifth amendment, "they were not engaging in a mere verbal exercise." United Stated v. Estepa, 471 F.2d 1132, 1136 (2d Cir. 1972). The fact that grand jury proceedings are secret, Ex parte, and largely under the control of the federal prosecutor, magnifies this concern. Aware of the potential for abuse inherent in grand jury proceedings, this court and others have increasingly exercised our supervisory power over the administration of justice to regulate the manner in which grand jury investigations are conducted. e.g., In re Grand Jury Proceedings, 486 F.2d 85 (3d Cir. 1973) (Schofield I); United States v. Jacobs, 547 F.2d 772 (2d Cir. 1976), cert dismissed, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed 2d 53 (1978); United States v. Estepa, 471 F.2d 1132 (2d Cir. 1972) (Friendly, J.)."  Further, the Third Circuit in Serubo noted its cases "do not stand for the broader proposition that use of the supervisory power to dismiss an indictment is never proper in the absence of actual prejudice. Prejudice to the individual defendant has never been required to justify the exercise of supervisory power. See, Note, The Supervisory Power of the Federal Courts, 76 Harv.L.Rev. 1656, 1657 (1963)." Further, the Third Circuit said "[b]ut we expressly recognized that the use of a prophylactic rule of dismissal might be appropriate. In doing so, we noted that the federal courts have an institutional interest, independent of their concern for the rights of the particular defendant in preserving and protecting the appearance and the reality of fair practice before the grand jury, an interest which could justify the imposition of a prophylactic rule in a proper case." The Third Circuit noted that "[o]ur reading of [United States v.] Birdman [602 F.2d 547 (3d Cir. 1979)] is that dismissal of the indictment may be proper even where no actual prejudice has been shown, if

there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends" <u>Serubo</u>, 604 F.2d 807 at 63. "We recognize that dismissal of an indictment may impose important costs upon the prosecution and the public. At a minimum, the government will be required to present its evidence to a grand jury unaffected by bias or prejudice. But the costs of continued unchecked prosecutorial misconduct are also substantial. This is particularly so before the grand jury, where the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened. We suspect that dismissal of an indictment may be virtually the only effective way to encourage compliance with these ethical standards, and to protect defendants form abuse of the grand jury process. . .we think that the prospect of cases lost because of attorney misconduct is likely to produce a sharp improvement in the procedures adopted by United States Attorney to control attorney conduct before the grand jury." <u>Serubo</u>, 604 F.2d 807 at 64-65. Fattah submits that in this case "the challenged activity [i]s something other than an isolated incident unmotivated by sinister ends." <u>Serubo</u>, 604 F. 2d 807 at 63.

9

The United States has made several misrepresentations to the Court as it relates to Mr. Amato's information and plea memorandum as of August 2014, as further discussed herein. The United States also made false statements as to Mr. Amato related to the search of Fattah's residence and office on February 29, 2012. These false statements have not been corrected as of this late date nearly 3 years later. The United States has also disclosed grand jury material in violation of Rule 6(e), of the Federal Rules of Criminal Procedure.

Fattah recognizes that the standard to quash an indictment is extremely high. "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988). Further, the district court must assess such claims using the "harmless error" standard. Id., at 255-56. In Bank of Nova Scotia, the Supreme Court identified two scenarios where dismissal of an indictment is appropriate: (1) where "structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice" or (2) where "the violation substantially influenced the grand jury's decision to indict,' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violation," which can establish the necessary prejudice. Id. at 256-57 (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986)). The grand jury has a historic role as "a primary security to the innocent against hasty, malicious, and oppressive prosecution." Kamisar, LaFave, Israel, Modern Criminal Procedure, ch. 15, 194 (1989). Fattah asks the Court to liberally construe this motion because he is appearing pro se. See, e.g., United States v. Johnson, 988 F.2d 941, 943 (9th Cir. 1993).

10

As this Court stated in an order denying a motion to quash the indictment in U.S. v. Mitan (E.D. Pa., Cr. No. 08-760-1, p.10 dated June 11, 2009), "[v]iolations that may warrant dismissal of an indictment are those violations of the 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,' including standards for prosecutorial behavior set forth in the U.S. Code. United States v. Williams, 504 U.S. 36, 46, n.6 (1992) (quoting Mechanik, 475 U.S. at 74 (O'Connor, J., concurring)). False declarations before the grand jury are criminalized by 18 U.S.C. § 1623. Therefore, perjury and prosecutorial misconduct, if prejudicial, would be grounds for quashing an indictment."

The Third Circuit said that "[o]ur reading of [United States v.] Birdman [602 F.2d 547 (3d Cir. 1979)] is that dismissal of the indictment may be proper even where no actual prejudice has been shown, if there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends" Serubo, 604 F.2d 807 at 63. Fattah submits that this is such a case. Fattah submits this is not a case where "the challenged activity" is an "isolated incident unmotivated by sinister ends".

Fattah respectfully requests oral argument, an evidentiary hearing(s) and submits this is such an instance where due process and supervisory powers are at issue.

**B.   The Violations of Defendants' Right To Due Process Warrant Dismissal Of The Indictment. Dismissal Is Also Warranted Under The Court's Supervisory Powers**

**A.   Mr. Amato and FBI Agent Haag Falsely Testified About Income and Expenses Related to Fattah's 2004 Tax Return, Working Capital, Fattah's 2004 Revenue and Counts 1-7**

Mr. Amato, speaking about Fattah's 2004 income, told the grand jury that

FattahGraphy, as an example, one of the trade names of Fattah's business in 2004, did not

earn more than a few thousand here or there ("Q. Well, then let me ask you this.

FattahGraphy was not a large business? We're talking about hundreds of dollars here and

there, correct?" A. "Yea, maybe a thousand here, a thousand there, correct" Ex. A at

14:12-17). That is a false declaration and inconsistent with Amato's interview memorandum

dated two years prior. In a government memorandum dated May 2, 2011, Amato

acknowledges Fattah "took photographs for clients and resold film he purchased for a profit"

(Exhibit B). The transaction Mr. Amato is referencing in the memorandum resulted in

revenue of approximately $34,000 to Fattah's business in 2004. Mr. Amato knew, that in

2004, Fattah's business signed a consignment agreement with a client to resell polaroid film

the client wanted to liquidate. Mr. Amato was directly involved in the transaction, initially

planning a series of auctions on eBay, which, due to his computer expertise, Mr. Amato was

more familiar with than Fattah. Further, Amato cannot claim he is unaware of the size and

scope of the project because he was Fattah's roommate, and their apartment was literally

filled up with boxes of polaroid film in every room of the apartment, including bedrooms,

totaling approximately 12,000 packages of polaroid film packed into 50 boxes. Mr. Amato

was there when the boxes were brought in, taken out a few days later and had many

discussions about this project with Fattah. Mr. Amato also delivered the film with Fattah to

the client in Queens, New York, following the Uhaul truck used to deliver the film. The

business received approximately $34,000 in 2004 from this single project and the profit was

approximately $17,000 on that one transaction (and a corresponding $17,000 expense),

which occurred after only a few days work. Mr. Amato telling the jury "Yea, maybe a thousand here, a thousand there, correct"(Ex. A at 14:16-17) misled the grand jurors and laid the groundwork for the jurors to believe that Fattah, and Mr. Amato, only had business loans with which to fund personal expenses and that his 2004 tax return was false. This is central to the allegations of working capital versus personal expenses in counts 1-7. Mr. Amato went on to tell the grand jury that no other Fattah business had clients, suggesting that FattahGraphy was the only business in 2004 with revenue ("Q. And you're not aware that he had any other source of income other than from the corporate entities that you have mentioned that were not making any money, right?" A. "Right" Ex. A at 33:8-12) ("Q. And you believe he was using these loans to support himself at the time? A. "I believe that he — Probably. And then — ". Ex. A at 14:8-11). It would have been reasonable based on Mr. Amato's statements for the grand jury to assume that a "few thousand here or there" did not total $140,000 in revenue for 2004, which has an effect on each of the seven counts at issue in this motion. This is erroneous, as in this one instance alone, Fattah could easily fund in excess of the total spent of several categories of the personal expenses the prosecutor asked about before the grand jury. For instance, the introduction section in the Indictment and prosecutor's question below show he asked questions about "jewelry" and "suits" (Ex. A at 34:2-5). There are no allegations that Fattah (ever) owned in excess of $17,000 in jewelry and suits, which is because that would be untrue. Fattah has never owned $17,000 in suits or jewelry. Clearly, in 2004 (and prior years) Fattah had the resources to purchase a purported $4,000 watch (actual cost approx. $2500), which the prosecutor (and Mr. Amato) also falsely suggested was purchased with business loan funds (Ex. A at 33:19-24). The watch was not purchased with

business funds, not speaking about profits. The prosecutor's leading question apparently

expected Mr. Amato to falsely state that FattahGraphy's receipts were, in fact, only a few

hundred dollars here and there. Mr. Amato also falsely testified that he did not have any

income other than student loans and lines of credit ("Q. You're basically living off school

loans and these lines of credit, funds of which you gave Fattah?" A. "Yes, I lived off student

loans, yes." Ex. A at 52:20-23). In October 2004, Mr. Amato signed a contract for $10,000

with a non-profit to provide consulting services regarding technology equipment and

installation, but he told the grand jury he did not have any money other than loans. Mr.

Amato is also aware that same non-profit paid more than $25,000 in late 2004 to Fattah's

company. Mr. Amato is also aware that Fattah's company had $25,000 in discretionary funds

based on that contract, which also were used to fund the various personal and business

expenses that Mr. Amato and the prosecutors emphasized in the grand jury could have only

been funded with business loans in 2005. Mr. Amato earned money on the project directly as

a result of Fattah's work for the non-profit. This is a false declaration on its face, in violation

of 18 U.S.C. § 1623. However, the prosecutor and Mr. Amato went on to emphasize their

position in a subsequent line of questioning.

Mr. Amato falsely testified that "[m]aybe 3 or 4 thousand dollars" when responding to

this question "Well, how much did you spend on the brochures and the business cards, et

cetera?" (Ex. A at 34:12-14). Mr. Amato told a bankruptcy trustee and a lawyer for one of the

banks at issue in counts 5-7, that nearly $60,000 was used of his debt on business expenses.

In response to a question about his debts in bankruptcy court, which included the loans at

counts 5-7, Mr. Amato said half or more of $110,000-$120,000 was used for business

purposes (E.D. Pa. Bankruptcy Case No. 07-14348-sr - Mr. Amato Bankruptcy Testimony

https://www.dropbox.com/s/nm5ldxc848v0ei5/Matthew%20Amato%20Testimony.wav?dl=0

last visited December 1, 2014 - Fed. R. Evid. 201 - Request for Court To Take Judicial

Notice Of Entire Hearing). He told the grand jury something completely different. This

inconsistent response, and false declaration, was not corrected by the prosecutor at the time

of Mr. Amato's testimony, or more than a year later when the prosecutor told the grand jury

that all of the live testimony transcripts were available for their review. In United States v.

Samango, 607 F.2d 883, the Ninth Circuit said the "[grand jury] transcript consisted of

testimony given nearly two years earlier . . .Since his testimony was in written form, the

prosecutor knew before he presented it exactly what it contained." The grand jury was also

not told of Mr. Amato's previous testimony under oath, which directly contradicts his

testimony before the grand jury, and previous FBI interviews.  For instance, Mr. Amato told

the bankruptcy court that the loan funds at issue in two of the counts, he used to purchase a

BMW (Mr. Amato Bankruptcy Testimony "In regards to the car situation, I did purchase a

car" at time 12:50). Mr. Amato also told the Court that he sold the BMW because he could no

longer afford it. Mr. Amato, under questioning by the prosecutors, only told the grand jury

that he gave the money to Fattah, wrote checks to Fattah and went in the bank at Fattah's

request due to Fattah's purported "bad" credit (A. "Well, Chaka came to me and said, "Well,

we need money for the business but my credit is bad." My credit — That's Chaka saying to

me." "Q. So you had good credit at the time?" A. "Yes." "Q. And he said his credit was bad."

A. "Correct" Ex. A at 12:23-13-20). Mr. Amato never tells the grand jury that it was him who

purchased the BMW, which was his testimony at bankruptcy Court (Mr. Amato Bankruptcy

Testimony "In regards to the car situation, I did purchase a car" at time 12:50). Mr. Amato was also never asked about this discrepancy before the grand jury. Mr. Amato and the United States were aware that Fattah did not have "bad" credit in 2005. To the contrary, counts 1-4 show Fattah was able to obtain lines of credit that total more than Mr. Amato obtained. The prosecutor, other than a few questions in which Mr. Amato stated he was not sure why Fattah had bad credit and perhaps it was missed payments by Fattah which led to that, did not inquire further. This was the case although the prosecutor was aware at the time that Fattah obtained (4) lines of credit from banks on the basis of Fattah's credit reports, including the banks Mr. Amato filed his applications with. It is reasonable to believe that if Fattah could not obtain loans due to his credit, the banks would have declined his applications. Further, the grand jury may have reasonably believed Mr. Amato which would be material to the elements of aiding and abetting, which is the United States's basis for counts 5-7. Without understanding why Fattah would have allegedly influenced Mr. Amato to apply for loans, it would have been difficult to assign the intent and knowledge required under 18 U.S.C. § 2. The same is true for the fact of who, either Fattah or Mr. Amato, actually decided to purchase the BMW, for business or any purpose. This lack of clarification or confrontation about these statements inevitably led to Mr. Amato appearing to be a more credible witness than he, in fact, was or would have been if these issues had been disclosed. Mr. Amato also falsely told the grand jury that Fattah went to banks with him as part of the applications in counts 5-7, and instructed him on how to fill out the applications. Mr. Amato also falsely stated that Fattah chose which banks Mr. Amato would apply for loans with.

Mr. Amato falsely stated that Fattah had no other funds to spend on personal or business expenses, including expenses such as restaurants and clubs ("Q. And you're not aware that he had any other source of income other than from the corporate entities that you have mentioned that were not making any money, right?" A. "Right" "Q. Okay, but you and he spent a significant amount of money during that time period, and correct me if I'm wrong, but from our prior conversation I gather he was driving a Land Rover during this time period?" A. "Yes." "Q. He had a $4,000 Cartier watch?" "Q. And these things were purchased with business funds that you thought he got and the business that you gave him, right?" A. "Yes." "Q. You went to restaurants often?" A. "Yes" "Q. And you guys — I'm saying you and he spent money on food, suits, jewelry, clothes, et cetera, right?" A. "Yes, he — Yes." Ex. A at 33:8-34:5). This testimony reinforced the idea that Fattah did not have funds to otherwise fund basic expenses, which is erroneous ("Q. And you and he would go to restaurants together? I mean both of you were taking advantage of this business money for personal use, right? A. "Yes, we would go out to dinner, yes" Ex. A at 53:16-20). The prosecutor further asked Mr. Amato, speaking to years 2005 and 2006 how many meetings he attended with Mr. Fattah, seeking to establish that there was no business activity, at the time relevant to counts 1-7. Mr. Amato, although he initially stated that he and Fattah attended a few meeting per week, for several years. ("Q. And I assume this car was not used much, if anything, for business purposes?" A. "Only when we were going to meetings downtown around center city. We would have a few — a couple of meetings per week. So it was used a couple of times per week for business." "Q. How many weeks did you have a couple of meetings per week in the roughly year-and-a-half or two years you had this car? Before you

named a couple of meetings. How many meetings were there?" A. "I would —" "Q. You mentioned Comcast and Sunoco. Who else were you — " A. "Out of a couple — Yeah, I mean it would be — it wasn't — Those were the high level ones that I can remember off the top of my head. I'm not sure how many meetings. Over the past — over the course of two years I'd say maybe 20 meetings." Ex A at 30:19-31:14) The prosecutor never inquired about the discrepancy between "a couple meetings per week" and "20 meetings" over the course of two years. A couple of meetings per week would, of course, equal nearly 208 meetings. That would have made a big difference in business use versus personal use. The prosecutor is attempting to establish that the BMW was not used for business purposes by Mr. Amato or Mr. Fattah, which goes to two of counts 5-7 regarding "working capital". The cumulative effect of Mr. Amato's false statements prejudiced Fattah in some clear ways, however, the full extent of the prejudice may have extended beyond counts 1-7. The prosecutor is testifying, or asking leading questions, when he says things such as "I assume this car was not used much, if anything, for business purposes?" Ex. A at 30:19-20. The prosecutor also referenced previous conversations with Mr. Amato, which in some cases may have constituted improper vouching of Mr. Amato's credibility by suggesting to the grand jury his story is the same as it has previously been. In other cases, the reference to previous discussions by the prosecutors were used to elicit the testimony they anticipated before the grand jury, and bring Mr. Amato back to their intended answers to certain questions. For example, during this exchange the prosecutor asked "So what are we talking? A couple of hours a week?" A. "Umm, it was more than that. I mean we — the time that I was there — the time that I was there working on this business we treated it like a full-time job where we

would — we try to, you know, work during business hours on the business as much as possible; in other words, discussing the business or working on the business plan. We tried to work on the business during the time that I was there because I wanted the business to work." "Q. I don't recall you telling us in our previous conversation that you spent — you tried to spend most of each business day talking about the business?" A. "Well, I mean we lived together. So we would always talk. Outside of meeting I can say that during the normal course of the day I would spend two to three hours — maybe a couple of hours working on the business researching, trying to come up with new ideas, things like that" (Ex. A at 36:21-37:19). Mr. Amato goes on to say "No, not that I know of" about whether there were clients, in response to the prosecutors asking "Well, did any of the researching by you or Fattah, coming up with new ideas, writing a business plan, did it ever end up that you had any clients that paid you anything?" (Ex. A at 37:20-24). Mr. Amato in the same testimony later agrees that the concierge service or other lines of business, other than FattahGraphy, never made any money ("Q. And you're not aware that he had any other source of income other than from the corporate entities that you have mentioned that were not making any money, right?" A. "Right" Ex. A at 33:8-12). This line of questioning is relevant to the "working capital" alleged false statement on counts 1-7. The prosecutor is pushing Mr. Amato to respond falsely about the extent of Fattah's business activities, to make the activities seem much less significant than they, in fact, were. ("Q. And you're not aware that he had any other source of income other than from the corporate entities that you have mentioned that were not making any money, right?" A. "Right" Ex. A at 33:8-12).

Mr. Amato falsely testified that he was unaware that expenses regarding restaurants, cell phone, and vehicle costs were claimed on Fattah's 2004 tax return related to Amato ("Q. But were you aware that these entries were in any official income tax return filed by Fattah? A. No." Ex. A at 42:20-24) ("Q. Did he ever talk to you about using any purported business expenses in your name in any tax return?" A. "No" Ex. A at 42:24-43:2). The prosecutor then asked "And none of these expenses occurred from what you know?" to which Mr. Amato responded "Yes, from what I know. Ex. A at 43:3-5" The government and Mr. Amato knew that Mr. Amato had visited Schnader, Harrison, Segal & Lewis LLP with Fattah for the sole meeting to discuss Fattah's 2004 tax return and the expenses that allegedly relate to Mr. Amato. Mr. Amato cannot truthfully testify he did not know about expenses which were discussed in a meeting with him sitting in a chair next to Fattah. Second, Mr. Amato falsely testified that he did not use his Pontiac "Sunfire" for any business purposes ("Q. Well, I guess you didn't use your Sunfire for business? You used the BMW I guess?" A. "Yes, I guess." "Q. Well, you didn't use your Sunfire for any legitimate business?" A. "Sunfire, no. I mean that was my first car. I forgot when I got rid of it."). Mr. Amato was, in fact, engaged in business activities in 2004, when he owned the sunfire, and received the funds related to that, and any other expenses which he claimed at the time. The United States has Mr. Amato's bank records, which undoubtedly show large cash deposits in 2004 that total more than Mr. Amato's car, cell phone, and restaurant expenses. Even if there were not enough cash deposits in Mr. Amato's accounts to cover, for instance, $10,000 in restaurants in 2004, that would not change the analysis. Mr. Amato, had more than $75,000 in credit cards in 2004, unrelated to counts 1-7. Mr. Amato could simply have told Fattah that he spent $10,000 in

restaurant expenses for business purposes on one of his credit cards. Mr. Amato falsely

testified that Fattah's handwriting appears on a document related to the expenses on Fattah's

2004 tax return ("Q. Well, flip to the next page. This is a page that's typed up. Do you

recognize the handwriting on here?" A. "Yeah, I recognize the — I don't see my handwriting

if that's what you're asking me." "Q. No, you recognize Fattah's handwriting on this?" A.

"Yes" Ex. A at 40:21-41:3). The government is aware that the document in question does not

contain Fattah's handwriting. The government obtained a handwriting exemplar from Fattah

pursuant to this investigation more than a year before the Indictment (approximate, exact

date unknown). The United States was aware, as of July 14, 2014, that a portion of the

handwriting on the documents provided by Schnader was identified by a former Schnader

employee as their own, not Fattah's ("Orr believed the handwriting on the "total budget"

document was his (Exhibit C p.12). Orr believed the handwriting outside of the box on the

"Business Name" document was his. Orr did not recognize the handwriting inside the box

but assumed it to be Fattah Jr's" Exhibit C p.13). While noting that Mr. Orr's incorrect

assumption more than 9 years after he met with Fattah and Mr. Amato has limited value, the

United States could have informed that grand jury prior to the return of the Indictment that

Mr. Amato's testimony about Fattah's handwriting on their exhibit "Amato-5" was erroneous

(Exhibit C, p.12-13). Now, over 130 days after the Indictment was returned, the United

States has never informed Fattah's previous counsel, the Court, or the grand jury about this

perjury by Mr. Amato. This question by the prosecutor and Mr. Amato's answer falsely gave

the grand jury the impression that Fattah was more involved with the preparation of the tax

return than he, in fact, was. Mr. Amato falsely stating that he did not receive any funds to

purchase his cell phone and pay his cell phone bill, restaurant expenses, and vehicle use and

maintenance costs had an effect on the grand jury. These declarations, coupled with the false

statement about Fattah's handwriting, could have easily influenced the grand jury and their

deliberations regarding the elements of 18 U.S.C. § 1014 charged in counts 1-7. For instance,

the statutory elements of "the defendant made a false statement to a bank" and "the

defendant knew the statement was false when he made them" in 2005.

Separate from Fattah's business activities, he received over $32,000 in student loan

refund checks in 2004 and had other resources, such as family support. The prosecutors and

Mr. Amato were aware of this while before the grand jury and proceeded to suggest that

purchases in 2004 and 2005 in categories such as suits, utilities, clothing, retail purchases,

restaurant and club expenses could not have been made by Fattah without the alleged misuse

of the loans at issue in counts 1-7.

Mr. Amato's final question before the grand jury follows the same pattern of

misleading answers and false declarations. Mr. Amato was asked "One of the things you said

[Fattah] got was a 55-inch plasma TV and stereo equipment, that type of stuff?" to which Mr.

Amato responded "Yes" (Ex. A at 53:21-24). As the government and Mr. Amato were aware

at the time of his testimony, the television and stereo equipment being referenced were

purchased in 2004, at least 6-18 months before Fattah applied for any loan at issue under

counts 1-4, and 6-12 months before Amato applied for any loan at issue in counts 5-7. The

government has documents which indicate when that television and stereo equipment was

purchased, and Mr. Amato had access to the documents during his testimony at the grand

jury, and clearly, before that date. Mr. Amato's testimony about the 2004 tax return, and

related to "working capital" in counts 1-7 was false, and clearly prejudicial, and the prosecution knew or should have known about all of it. The United States cannot claim that, at the very least, some of Mr. Amato's false statements were clear then, could have been discovered during the 14 months after Mr. Amato's testimony prior to the return of the Indictment, or that Mr. Amato's testimony as to several of the false statements herein are now clearly false. The United States should not be able to proceed to trial on an Indictment secured with perjured testimony, and which could not have been accomplished without the aid of the prosecution. The United States was not satisfied solely with Mr. Amato's false statements about the 2004 tax return, and correspondingly the "annual sales of $140,000" and "working capital" alleged false statements throughout counts 1-7. Clearly, the United States thought it was important, in order to bring a false statements prosecution related to the annual sales figure of $140,000 to falsely establish that the figure was incorrect. The working capital alleged false statements were, in part, established by falsely stating that since Fattah did not have significant revenue in 2004, and did not have those expenses, that he may never have actually operated or intended to operate a business, but that he never spent more than 3-to-4 thousand dollars on business expenses. The United States went even farther, eliciting false statements about the 2004 tax return from FBI Agent Haag.

The prosecutor asked Agent Haag, during his grand jury testimony on July 15, 2014 "In fact isn't it part of our case that the income tax return that was prepared for Mr. Fattah in 2004 was fictitious?" to which he responded "Correct" Ex. J at 17:20-23. Further, the prosecutor asked "And it would be fair to say that the evidence concerning this shows that it's entirely fictitious; am I correct about that?" to which Agent Haag answered "Correct" Ex.

J at 39:12-15. The exchange continues with the prosecutor asking "First of all, 259 Strategies was first registered with the state in 2005; is that correct? to which Agent Haag answered "Correct" Ex. J 39:16-19. That answer is false and misleading, Fattah obtained a business privilege license on January 11, 2002, which is referenced in documents in the United States possession regarding the 2004 tax return. The license applies to "259 Strategies" and correspondingly Fattah's "2004 tax return", among other trade names, in 2004. The United States knew this prior to Agent Haag's testimony. Mr. Amato's false testimony was repeated by Agent Haag ("Q. Mr. Amato said that the notations on his expense chart, according to him, were entirely false; am I correct?" A. "Correct" "Q. He said at most he and Fattah spent maybe 3 or 4 or 5 thousand dollars total over a lengthy period of time on any business — legitimate business expense for Fattah's proposed entrepreneurial business entities; am I correct about that?" A. "Correct" Ex. J at 40:16-41:4) ("Q. And our position is that Fattah essentially created this return, paid the tax on it to use this return and other information from the return for the lines of credit on the bank loans he took out and Amato took out in 2005; am I correct?" A. "Correct" Ex. J at 41:15-21). Those statements, while in some cases correct in that they only confirmed Mr. Amato's false testimony, were in other cases false and misleading. The United States is aware that the return was not created by Fattah, that Amato told the bankruptcy court he spent approximately $60,000 ["half" or "more" of $110,000-$120,000 in debt] on business expenses, that Fattah did incur expenses listed on his 2004 tax return. Even if the United States does not believe every line on the return, they clearly know it is not "entirely fictitious" (Ex J. at 39:14). Bank records, and other documents which the United States purports to have obtained, show expenses that are entirely consistent with the

2004 tax return. One example is the $17,000 in film, listed as an expense on the 2004 tax return. Another example is the calendar and other film developing costs. Mr. Amato testified that he believed the "rental [of] egypt nightclub" did, in fact, happen and that Fattah saw the event as an attempt to earn money or revenue, i.e. a profit seeking business activity (Mr. Amato: "That could be — he rented out a club in Center City to throw a party in the hopes to make money off admission fee[s][sic] to the club. So I think that's what it is." Q. He rented the place and charged people admission, and he wanted to make money from people paying at the door? Is that what you're saying? A. "I believe that's what he wanted to do, yes" Ex A at 40:1-17). Both Agent Haag and the prosecutor knew at the time that Mr. Amato said that this expense was likely to have occurred. The United States also could have contacted the management office for egypt nightclub. The club is closed, but its ownership continues to operate, and owns 5 of more entertainment facilities, and may have records or recollection of the event. The United States also is aware of the depreciation schedule attached to the 2004 tax return, prepared by Schnader, which shows where another $18,318 in expenses derived from. The United States is aware that Fattah paid $2,700 for Schnader to prepare the 2004 tax return, but the prosecutor's question suggest that Schnader simply signed a return Fattah produced which they knew to be false. They do not, either in questioning Mr. Amato or Agent Haag ask any question which would suggest what reason a top ten Philadelphia law firm, experienced in tax return preparation, would simply lend its reputation and professional experience to develop such a purported false return. The accountant who prepared the return worked for 7-8 years as a tax accountant. It seems reasonable that he would know more about tax return preparation than Fattah or Mr. Amato. Agent Haag next falsely testified that

he did not ask Francis Orr certain questions. Mr. Orr is the accountant at Schnader who, in conjunction with other Schnader personnel, prepared the return. The prosecutor's questions, in this instance, suggest that he is looking to respect the attorney-client relationship and attorney work-product privilege between Fattah and Schnader, his retained counsel in 2005, who prepared the 2004 tax return as part of Fattah's attorney client relationship ("Q. You and Agent Scheffer also spoke with the accountant who was involved in the preparation of the 2004 income tax return; am I correct about that?" A. "Correct." "Q. And the accountant was hired through an attorney at Schnader Harrison is that right?" A. "Correct." "Q. So you did not ask the accountant what Fattah told him or what he told Fattah as part of the preparation of his income tax return?" A. "Correct." Ex. J at 42:11-22). However, Mr. Orr's interview report, prepared by Agent Haag suggests that he did ask Mr. Orr what "Fattah told him" as part of the preparation of the 2004 tax return (Exhibit C p.3). Agent Haag's interview report says "Orr was not provided any records from financial institutions or supporting documents but was told by Fattah Jr. that Fattah Jr. had such records" (Exhibit C p.3). On its face, Agent Haag was "told" in response to his questions what Fattah allegedly told Mr. Orr as part of the attorney-client relationship as to the 2004 tax return. The documents referenced in the interview report, presented as an exhibit, and testified to by Mr. Amato and Mr. Haag before the grand jury, entitled "total budget", and also another document referenced in Mr. Orr's investigation report as "Business Name" were documents provided to Mr. Orr and an attorney at Schnader, which were drafted at their request. Mr. Amato provided information related to these documents to Fattah. These are not documents that Fattah had developed prior to contacting Schnader and being asked to bring them to the meeting, which was also

attended by Mr. Amato. The supporting documents were prepared to obtain legal advice from Schnader. Fattah believes that not only did Agent Haag falsely state that he did not ask Mr. Orr what Fattah told him or what he told Fattah, but that the documents the United States obtained, total budget and business name, should never have been given to the United States in violation of Fattah's attorney-client privilege, to which, the United States has never sought any exception thereto, and apparently wanted to respect as late as July 15, 2014. That is not the primary issue in this motion, but is relevant to the United States's overall conduct in this matter. The false declarations of Agent Haag, an experienced FBI Agent, in conjunction with the leading questions mischaracterizing Mr. Amato's testimony were likely given significant weight by the grand jury during their deliberations. The elements of 18 U.S.C. § 1014, including that a false statement was made, what the purpose of that statement was, and whether the defendants knew the statement was false at the time it was made are all implicated. The 2004 tax return, although only directly characterized as false in count 1, is clearly the source of the $140,000 in sales (including $141,000), in counts 1-7. The statements by both Mr. Amato, and Agent Haag, with considerable prosecutorial misconduct, including leading help, vouching, lack of full disclosure about Mr. Amato's credibility regarding the bankruptcy testimony and other government documents. These are not concerns about the lack of exculpatory evidence presented to the grand jury, these are simply issues of perjury, in violation of the U.S. Code, the lack of due process, and the sheer disregard for Fattah's rights as a U.S. Citizen to not have to answer for serious crimes not presented by Indictment by a unbiased, grand jury acting independently of the prosecutor.

Finally, there was a critical question by the prosecutor "Was there a management consulting business, Chaka Fattah, Jr. & Associates that made $140,000 in business sales in the previous year before this application?". Mr. Amato responded "I don't believe so". The prosecutor followed up, pushing Mr. Amato to conform to the prosecution theory, "Well, you either know or you don't, right?" to which Mr. Amato said "No. No, there was not". Followed by "So these are false, right?" to which Mr. Amato responded "Yes" (Ex. A at 27:9-18). Fattah submits, again, that only one answer can be truthful. Either Mr. Amato does not believe there was the named company with the $140,000 sales revenue, or he is sure the answer is no. An element of the offense charged in counts 5-7, is that "The defendant knew the statements were false when he made them" (Amato Guilty Plea Memo, p.1). If Amato did not know definitively in 2005 that the company allegedly did not make "$140,000", then his statement was not "false when he made" it under 18 U.S.C. § 1014. This testimony, given nearly 8 years after Mr. Amato applied for the loans in counts 5-7, is false as it relates to "No. No, there was not" a management consulting firm, Chaka Fattah Jr. & Associates which had $140,000 in revenue in 2004. Fattah submits that the prosecutor clearly knew that "I don't believe so" is not the answer he needed to secure an Indictment as to these counts.

**B.  Mr. Amato Falsely Testified That Chaka Fattah Jr. & Associates Did Not Exist**

Mr. Amato told the FBI, on August 3, 2011, that he "did not know if CFJA was an actual registered business entity." That story quickly changed. After significant time working with the prosecutors and the FBI prior to his grand jury testimony, Mr. Amato unsurprisingly told the jurors something different. Mr. Amato told the grand jury "That's correct", in response to this question from the prosecutor: "There really was no ongoing entity by that

name". See also ("Q. And Fattah was not doing any business in that name that you are aware of when you signed this application?" A. "Correct." "Q. So this is false?" A. "Yes" Ex. A at 20:5-8). This is contrary to Mr. Amato's grand jury testimony about working on the business every day during the time he was there. (Mr. Amato: "Umm, it was more than that. I mean we — the time that I was there — the time that I was there working on this business we treated it like a full-time job where we would — we try to, you know, work during business hours on the business as much as possible; in other words, discussing the business or working on the business plan. We tried to work on the business during the time that I was there because I wanted the business to work" Ex. A at 36:23-37:8). The prosecutor, did not attempt to bring Mr. Amato back to his previous statement about working on the business. Mr. Amato was aware at the time of his testimony that Fattah was doing business under that name, among others.

Fattah submits that "not knowing" (as Mr. Amato told the FBI) is different than saying "correct" when a prosecutor asks under oath whether Mr. Amato knows the answer to the question before the grand jury. Fattah notes that it is also a violation of 18 U.S.C. § 1001 for Mr. Amato to have given a false statement to the FBI on August 3, 2011. Without help from the government, Mr. Amato conceded he did not know at that time whether or not "Chaka Fattah Jr. & Associates" existed on the dates of his bank applications in counts 5-7, in 2005.

An element of the offense charged in counts 5-7, is that "The defendant knew the statements were false when he made them" (Amato Guilty Plea Memo, p.1). If Amato did not

know in 2005 that the company allegedly "did not exist", then his statement was not "false when he made" it under 18 U.S.C. § 1014.

Mr. Amato also falsely said that there were "no associates" at Chaka Fattah Jr. & Associates. This assumes that Mr. Amato was not, in fact, an associate (referencing the company name, not Mr. Amato's title) working for that company. Mr. Amato seems to say anything that is convenient that will help him, no doubt with help and extensive preparation from the United States. Mr. Amato clearly told the bankruptcy court he believed in the business and invested in it. The United States' activities during this investigation helped Mr. Amato reach the different, inconsistent position he took before the grand jury. As the prosecutor stated at the beginning of Mr. Amato's testimony "And part of your cooperation to date has been meeting with the FBI agents and myself" Ex. A at 4:19-20.

Mr. Amato gave testimony under oath before the U.S. Bankruptcy Court for the Eastern District of Pennsylvania. The United States was aware that Mr. Amato filed bankruptcy for at least three years during the investigation prior to the present Indictment.

Mr. Amato told the bankruptcy Court in 2007 that regarding "Chaka Fattah Jr. & Associates" he was not sure of the date the company was founded but that it was "2 or 3 years ago". Mr. Amato replied "yes" when asked if that was the "concierge service [he] alluded to earlier?" He said that "Chaka Fattah Jr. & Associates" was founded by "Chaka Fattah Jr". Mr. Amato was then asked "and [w]hat capital did you use to start that company", to which Mr. Amato replied "whatever I had on hand". While Mr. Amato indicated he was not sure how much he invested at the time the company was founded, he said "it was a couple thousand [dollars]". Mr. Amato said "it wasn't any formal partnership. He started it, I

wanted to be involved in it, I put money into it." Mr. Amato also said he stopped working for the company "a year ago". Mr. Amato was asked "was (inaudible) there anybody else, any other partners, just the two of you", to which he said "No, Yea". It cannot be disputed that Mr. Amato, at the bankruptcy hearing, clearly answered many questions about the company. Mr. Amato never stated that the company did not exist during that hearing, or his FBI interview memorandum. Fattah submits it would be reasonable to believe that Mr. Amato represented that the company existed at the times relevant to counts 5-7, during the hearing. Now, while testifying nearly 6 years later before the grand jury, Mr. Amato has changed that story (E.D. Pa. Bankruptcy Case No. 07-14348-sr - Mr. Amato Bankruptcy Testimony https://www.dropbox.com/s/nm5ldxc848v0ei5/Matthew%20Amato%20Testimony.wav?dl=0 (2007)).

In response to this question, "[t]he company itself, was the company organized as a business entity under the state of Pennsylvania, in any way, did you file any papers with the department of state in Harrisburg? Either partnership documents, llc, corporate papers, any sort of business form, filing that you're aware of?" to which Mr. Amato said "Umm..I believe that there was an LLC filed. Um, I believe there was an LLC filed. I don't know for sure, because I wasn't really involved in any of that work." Mr. Amato said under oath that he believed the company existed, albeit as an LLC. Further, he said even if it was not an LLC, he did not know. Mr. Amato then told the grand jury the company did not exist under multiple questions. This was clearly a false declaration under 18 U.S.C. § 1623.

### C. Mr. Amato Falsely Testified That He Never Held A Management Position or Ownership With CFJA or Fattah Related Entity

Mr. Amato, in his federal bankruptcy petition, listed Fattah under "Former partners, officers, directors and shareholders" (Exhibit K p.11). Mr. Amato, under penalty of perjury, on the bankruptcy petition stated under a section that requires information on "all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed…" (Exhibit K p.10). Mr. Amato's bankruptcy petition references 259 Strategies LLC, as the business he was involved in and is silent as to Chaka Fattah Jr. & Associates other than listing the loans at issue in count 5-7 for discharge. Mr. Amato also, under a section titled codebtors was asked to "[p]rovide the information requested concerning any person or entity…that is also liable on any debts listed by debtor in the schedules of creditors." Mr. Amato checked a box that stated "[c]heck this box if the debtor has no codebtors" (Exhibit K, p. 8). Fattah submits that Mr. Amato has already stated, under penalty of perjury, that no other person is "liable for" the debts to the banks in count 5-7.

Mr. Amato told the bankruptcy Court that he invested to start Chaka Fattah Jr. & Associates, prior to taking out any loans in counts 5-7 (Mr. Amato Bankruptcy Testimony). He further stated that he, at the time, of the loans believed in the business and expected to share in the profits. Fattah submits that Mr. Amato lied about his title (Ex. A at 28:2-3) at Chaka Fattah Jr. & Associates, and in saying he was not an owner. In subsequent questions during the bankruptcy hearing he does not object when referenced as other principals or partners. A principal is an owner, as is a partner. While he did, prior to that say he was not an owner, this is also surprising considering all his other statements at that creditors meeting, or

throughout this investigation. Fattah is referencing statements about him expecting to receive future profits by Mr. Amato.

In 2005, a federal EIN number application was filed listing Matthew Amato as a "member" of 259 Strategies, LLC. In 2005, the only checking account in the name of 259 Strategies LLC, was held by Mr. Amato at commerce bank. Mr. Amato had business cards for 259 Strategies holding the title of "Vice President" (Exhibit D). Mr. Amato, gave these business cards to many individuals the company was seeking to do business with for several years. In addition, Mr. Amato had business cards for American Royalty, another Fattah business trade name, listing him as the "Senior Vice President" (Exhibit E). Even Fattah's 2005 business cards for 259 Strategies list him as the "Managing Partner", which would have reasonably led people to believe in meetings Mr. Amato attended that Mr. Amato was a partner of Fattah's business. Mr. Amato also told the bankruptcy court that he invested, with his own funds not from the loans at issue, in the business at the beginning with the expectation of receiving profits in the future. Mr. Amato also received profits as early as 2004.

Mr. Amato falsely told the grand jury he was not the vice president of 259 Strategies. ("Q. So I assume that's incorrect? You were not the vice president of 259 Strategies, right?" A. "Right" Ex. A at 45:10-13) (*See* Exhibit D). Further, Mr. Amato falsely stated that he never spoke with Fattah regarding the minority certification application, and his listing as the vice president of technology ("Q. Did he ever have a discussion with you in which he said he was going to claim you as the Vice President of Technology of 259?" A. "No" Ex. A at 47:18-21). Mr. Amato told the grand jury that "I don't remember if he specifically asked me

— gave — you know, I don't remember if he specifically said I need it for this particular purpose…" Ex. A at 47:9-12. Fattah submits that only one of those statements can be true. Either Mr. Amato does not "remember", or he does remember and there was no "discussion" about the minority certification. The same is true for Mr. Amato's false declaration about never discussing the commission policy accompanying that application (Ex. A at 48:12-21). Mr. Amato makes additional false statements about never receiving "anything" in 2004 related to Chaka Fattah Jr. & Associates (Ex. A at 27:25-28-1). Mr. Amato makes additional false declarations about the business account at Capital Grille and what its purpose actually was (Ex. A at 49:16-24). Mr. Amato goes on to make false declarations about Amir Campbell's involvement with 259 Strategies LLC (Ex. A at 35:22-36:1). Mr. Amato was aware that Mr. Campbell was involved with business activities such as the film project mentioned above, assisted in graphic design projects, and other activities. Mr. Amato also makes false declarations about Fattah's activities at his apartment, in terms of work ethic, or attempting to produce successful business results.

**D.  The United States Has Made False Representations To This Court Related To Mr. Amato and Fattah**

Mr. Amato's guilty plea memorandum, filed by the United States, says that "[w]hen confronted and interviewed by the investigators…he knew that CFJA was essentially non-existent and had no earnings. FBI investigation has found no IRS employer identification number, no federal, state or municipal tax documentation, or any other legitimate business-related documentation concerning CFJA" (Amato Plea Memorandum, p.3). Further, the memorandum says that Amato "stated he did not know of any successful business activities

34

by anyone (himself included) conducted by CFJA. Amato believed that CFJA was a fictitious name created solely for the purpose of his establishing lines of credit." Mr. Amato's plea memorandum says "In Spring 2006, nearly a year [after] Amato turned over the proceeds of his loan applications to Fattah, he received $15,000 from Fattah. Amato understood these funds came from the sale of the BMW Fattah bought with previous loan proceeds. Investigators have corroborated Fattah's sale of the BMW for $31,000, and his retention of the sale funds. Amato understood theses funds to be his return on his "investment", that is, the loan proceeds he received and furnished to Fattah." The United States also filed an information against Mr. Amato which states that "CFJA was not an existing business entity" (Amato Information, paragraph 2). Further, the information states that "In fact, at the time AMATO knew that CFJA was not an existing business entity" (Amato Information, paragraphs 4, 6).

There are a number of issues regarding the above statements. First, the statement about the "FBI Investigation" not having found any IRS employer identification number is misleading. In August 2003, Fattah filed for a employer identification number for his business. The business, had a legal name of Chaka Fattah Jr., and a trade name of FattahGraphy. The EIN number is 86-1071047. However, as the United States is aware, that EIN number was legally permitted to be used for CFJA. CFJA and FattahGraphy are trade names. As noted on the IRS website, "[g]enerally, a sole proprietor should file only one Form SS-4 and needs only one EIN, regardless of the number of businesses operated as a sole proprietorship or trade names under which a business operates". (Exhibit F - Instruction for

[EIN] Form SS-4 http://www.irs.gov/instructions/iss4/ch01.html). Thus, even though CFJA, a trade name, did not have its own EIN, it could be used pursuant to the IRS's own rules.

Second, the United States did not inform the Court that Mr. Amato, in an August 3, 2011 interview with investigators, said he "did not know if CFJA was an actual registered business entity" (Exhibit G). The United States also did not inform the Court of Mr. Amato's bankruptcy testimony, in which he stated clearly that Chaka Fattah Jr. & Associates was a luxury concierge service. Hence, at the bankruptcy hearing, under oath, he clearly stated that it was an entity. The United States memorandum could have led the Court or a reasonable person to believe that Mr. Amato was definitive in saying that "he knew that CFJA was essentially non-existent and had no earnings." As an initial matter, what is "essentially" non-existent. Either a company, or in this case a trade name, exists or it does not. The United States had an obligation to inform the Court, that the FBI memorandum seems to state clearly that Mr. Amato was, at best, unsure about the existence of an entity. Not being sure, is different that saying Mr. Amato knew something.

Third, the United States is well aware that Mr. Amato did not "receive $15,000 from Fattah" (Exhibit H). Mr. Amato sold his car because he could not afford it, according to his testimony at the bankruptcy court. Even if the United States did not have his testimony before the bankruptcy court, their investigation showed that Mr. Amato deposited the $31,000 in sale funds into an account he controlled at Commerce bank in the name of 259 Strategies LLC (Exhibit H). The handwriting on the withdrawal slip for the $15,000 the government is referencing is Mr. Amato's (Exhibit H). Fattah had no control over the account, and his signature or name does not appear on the withdrawal slip. The statement

that "[i]nvestigators have corroborated Fattah's sale of the BMW and his retention of the sale funds" is false on its face (Exhibit H). It is impossible for Mr. Amato to have sole control of the BMW sale funds, and simultaneously have received $15,000 from Fattah derived from the same funds (Exhibit H). Notably, the back of the withdrawal slip (Exhibit H) contains handwriting which says "PA DL, 27623439 Ex. 8/26/06 Matthew T. Amato". Fattah notes that PA DL, likely stands for Pennsylvania Driver's License, and the number next to it is likely Mr. Amato's driver's license number. Fattah notes that the bank appears to have written this remark to verify that they checked Mr. Amato's identification. Fattah's drivers license number or other identifying information do not appear on the document, which is indisputable. Notably, Fattah's driver license number is not on the document (Exhibit H). Investigators and the United States are also aware that the statement "his retention of sale funds" referring to Fattah is erroneous (Exhibit H). Fattah did not control the sale funds, and any expense out of that account would have had to been made by Mr. Amato. Even if Mr. Amato made an expenditure for Fattah, that would have been Mr. Amato's sole decision.

Fourth, the statement that "Amato understood these funds to be his return on his "investment", that is, the loan proceeds he received and furnished to Fattah" is erroneous and misleading. Amato sold his car and received the proceeds (Exhibit H) (E.D. Pa. Bankruptcy Case No. 07-14348-sr - Mr. Amato Bankruptcy Testimony https://www.dropbox.com/s/nm5ldxc848v0ei5/Matthew%20Amato%20Testimony.wav?dl=0 ). In that way, yes, Mr. Amato "understood" those funds to be a loss against the money he allocated for the car purchase. But that is not something Fattah ever told him. Even characterizing the alleged statement as a return on investment is something that is false on its face. However, the way

that statement was written could have led the Court to believe that Amato was not only given $15,000, but that he was told by Fattah this was his "return" (Exhibit H).

Fifth, the business privilege license, which includes the trade name Chaka Fattah Jr. & Associates could be characterized correctly as municipal tax documentation (Exhibit L). But, the United States, said that "FBI Investigation has found no...municipal tax documentation." The business privilege license, in part, evidences the establishment of a city tax account for the business. The Court usually presumes as truthful, representations made by government counsel, as they are officers of the court ("The court is entitled to rely on the representation of counsel, as officers of the court…" United States v. Johns, 336 F. Supp. 411, 24 (M.D. Pa 2004) (Attorneys are officers of the court and a judge has the right, in most circumstances, to rely on their representations to him" Theodore v. State of New Hampshire, 614 F.2d 817, 822 (1st Cir. 1980) ("[t]he prosecutor has a duty of good faith to the court, the grand jury, and the defendant" United States v. Basurto, 497 F.2d 781, 786 (9th Cir. 1974)).

The United States also made false statements to the Court at Mr. Amato's plea hearing on August 14, 2014. These include statements during the Court's questioning about the factual basis for the plea. Fattah requests that the Court order the United States to confirm or deny the veracity of the statements they made at that hearing.

The false statements to the Court by the United States show a willful disregard for the facts and the obligations of the United States to be truthful in all court communications. Respectfully, Fattah submits the United States should have ensured that all court communications in this matter were accurate and not misleading. The United States plainly failed to do so with Mr. Amato's plea memorandum and information. However, the United

States previously misled the Court about Mr. Amato and Fattah nearly 30 months earlier than the date the Indictment was returned.

**E.   The Search Warrant Affidavit Contained False, Conclusory Allegations, Related to Mr. Amato and Fattah. The Fabrication of Evidence Violated Due Process**

Agent Haag filed a search warrant affidavit in February, 2012, with a Federal Magistrate Judge to obtain a search warrant to enter Fattah's home and business on February 29, 2012. The search warrant affidavit contains false statements, material omissions and misleading statements regarding Mr. Amato and Fattah. First, Agent Haag did not inform the Magistrate Judge that Mr. Amato had a custom-made BMW built in Germany to his specifications, had it shipped to Philadelphia and subsequently purchased it with approximately $45,000 of the loan funds. Also, Agent Haag did not inform the Magistrate Judge that the BMW was purchased in the name of a business, insured in the name of a business, which may have had an impact on the Magistrate Judge's analysis of Agent Haag's conclusory statement that "[o]nce Amato obtained the funds, he transferred them to Fattah, who then used the proceeds of the three business lines of credit for personal items". Agent Haag did not inform the Magistrate Judge that the BMW was registered to an address (74 16th St.) in Jericho, New York, at Mr. Amato's childhood home. Agent Haag similarly did not inform the Magistrate Judge that Mr. Amato obtained business car insurance for the BMW, naming himself as an executive, partner or owner of 259 Strategies LLC. Fattah's name did not appear on the car insurance application, or auto insurance policy. Agent Haag did not inform the Magistrate Judge that the car had New York license plates. Agent Haag simply stated "[o]nce Amato obtained the funds, he transferred them to Fattah, who then used

the proceeds of the three business lines of credit for personal items, not business uses, as required." Agent Haag's affidavit says "Amato said that Fattah…told him how to fill out the applications, including specific instructions to use the names 259 Strategies and CFJA as the business entities for which Amato was applying for loans and to claim, falsely, that he was an officer of those entities"(p.9). Again, Mr. Amato was an officer and owner of Fattah's businesses for several years, including the relevant time frame in 2005 (Exhibit K, p.11 & Exhibit D, Exhibit I). Agent Haag did not inform the Magistrate Judge that Mr. Amato opened (4) business bank accounts representing himself to be owner and officer of the relevant Fattah business names.  Agent Haag erroneously told the Magistrate Judge that Mr. Amato did apply for one of the loans at issue in counts 5-7 and the affidavit using the business name "259 Strategies" (p.9). Agent Haag did not inform the Magistrate Judge that an IRS EIN number application was filed in 2005 for 259 Strategies LLC, with the signature line "Matthew Amato, Member" (owner) (Exhibit I). Agent Haag said "Fattah repeatedly assured Amato that he was using the money provided by Amato to grow the concierge business", however, Mr. Amato told the bankruptcy court that he purchased a BMW in the business name. At bankruptcy court, Mr. Amato clearly stated he sold the car because he could not afford it anymore. How could Mr. Amato sell a car that wasn't his? The BMW, is approximately $45,000 of the $65,000 Mr. Amato obtained, so clearly, that statement is not accurate if it means anything other than the BMW regarding $45,000 (plus insurance) of the funds. Mr. Amato acknowledged in 2007, at the creditors meeting, that he purchased the car, he cannot claim to not know the source of funds. Agent Haag further said "Amato told me that in spring of 2006, after Amato turned over the proceeds of his loan applications to

Fattah[sic], he received $15,000 from Fattah. He understood these funds came from the sale

of a BMW Fattah bought with loan proceeds and later sold. He also understood these funds

to be his return on his "investment", that is, the loan proceeds he received and furnished to

Fattah". Agent Haag made the statement that Mr. Amato received "$15,000" from Fattah

with reckless disregard for what the bank records show for that transaction (Exhibit H).

Namely, that Mr. Amato deposited the entire BMW sale funds into his account, and took the

money out, without any help or assistance from Fattah (Exhibit H). Agent Haag further states

"When Fattah sold the vehicle for $30,000 approximately one year later it had over 31,000

miles on it. Amato was paid $15,000 by Fattah, which he believe came from the proceeds of

the sale of this car, and that Fattah[sic] keep the remaining $15,000." Fattah did not sell the

BMW, Mr. Amato sold it as he told the bankruptcy court, in clear terms (E.D. Pa. Bankruptcy

Case No. 07-14348-sr - Mr. Amato Bankruptcy Testimony https://www.dropbox.com/s/

nm5ldxc848v0ei5/Matthew%20Amato%20Testimony.wav?dl=0 ). Mr. Amato was, again,

not paid anything by Fattah regarding the BMW, since the $15,000 that has been referenced

many times was drawn from Mr. Amato's own business account, of which, he was the only

signer (Exhibit H). The car also had 21,000 miles on it, not 31,000 (Exhibit H, memo line).

Agent Haag also omitted the fact that when Mr. Amato purchased the BMW, Fattah owned a

land rover, and subsequently purchased another one. This was done to suggest that the car

was for Fattah's personal use, when that is simply not true. Agent Haag referenced Mr.

Amato's bankruptcy in the affidavit, "these three loans were forgiven in the bankruptcy

proceeding". This shows the United States was aware, as of February 2012, and likely

sooner, that Mr. Amato had appeared before the bankruptcy court. These false and misleading

statements by Mr. Amato and Agent Haag possibly had an impact on the probable cause related to the search warrant, but this also shows that the United States has made false and misleading statements to this Court as early as February 2012 as it relates to Mr. Amato and Fattah.

The search warrant affidavit (p.9) also says "Amato believed CFJA was a fictitious name created solely for the purpose of establishing lines of credit." Amato clearly told the bankruptcy Court when he believed the company was founded, what services the company provided, and answered numerous questions about CFJA. This statement was false and made with reckless disregard for Fattah's rights. In the FBI Interview dated August 3, 2011, Mr. Amato told Agent Haag that "he did not know if CFJA was an actual registered business entity." However, that is not what Agent Haag told the Magistrate Judge.

**F.   Mr. Braxton's Grand Jury Testimony Contained False Declarations, In Violation Of 18 U.S.C. § 1623**

Anthony Braxton, speaking as the former senior lending officer at United Bank, gave perjured and misleading testimony on June 25, 2013 which resulted in the present Indictment as it relates to count 12. Fattah does not make this accusation lightly and that assertion is fully supported by this filing and exhibits referenced herein. Mr. Braxton was told, by the questioning prosecutor "…as a witness before the Grand Jury, you've taken an oath to tell the truth, and you have an obligation to tell the truth to the Grand Jury. Do you understand that?" to which he responded "Yes, I do." Further, Mr. Braxton was told "If you fail to tell the truth, if you tell a willful falsehood to the Grand Jury, you yourself can be prosecuted for a separate

criminal offense which is perjury before the Grand Jury. You understand that; don't you?" to which he responded "Yes, I do". *See* Exhibit M (Braxton June 25, 2013 Trans.) at 4:10-23.

Mr. Braxton told the following to the grand jury: (1) the personal financial statement Fattah provided to the bank on March 15, 2011 as part of the application process did not reveal the existence of over $15,000 in credit card debt ("Q. And does that reveal the existence of any loans over $15,000 to credit cards? A. "No, it does not." Ex. M. at 13:25-14:2); (2) affirmatively answered that the lack of the $15,000 credit card debt information may have influenced the bank's decision to make this loan ("Q. Now that information as well as the cash flow information, was that part of the information that the bank utilized in making its decision whether to make this loan?" A. "Yes." Ex. M at 14:3-7); (3) expressed that the idea that any business funds being used for gambling purposes may have influenced the bank's decision to make the loan and that actual or perceived gambling expenses would have raised eyebrows prior to the bank making the loan ("Q. Had you seen line entries for payments to Harrah's Casino and the SugarHouse Casino and other casinos as something that this business wanted to make payments on out of the loan proceeds from the bank, would that have raised eyebrows at the bank so to speak?" A. "Yes.", "Q. You would have been concerned about that as not being a legitimate business expense, correct?" A. "Absolutely." Ex. M. 14:25-15:10); (4) expressed that a IRS debt would have raised some concerns in terms of the viability or approval of this loan ("Q. Had you seen the existence of a $86,735 debt to IRS owed by Mr. Fattah, Jr., would that have raised some concerns in terms of the viability of this loan." A. "Yes, it would." Ex. M at 15:11-15); (5) suggested that Fattah misrepresented his accounts receivable in order to request the entire $50,000 in April 2011

("Q. Can you tell us approximately how much was paid on the loan during the first month or

so of its existence?" A. "I believe it was approximately 24,000, 24, 25 thousand dollars we

received. I believe it was approximately a month or so subsequent to the loan closing." Ex.

M 18:25-19:26); (6) suggested that the September 2011 financial statement was accurate and

the March 2011 statement was false ("Q. Now, had the bank been aware of his various

liabilities as displayed in the September 2011, financial statement back in March of 2011

when it was originally making the loan, would that have been a significant and material fact

for the bank?" A. "Yes, it would." "Q.  Would that have caused the bank to pause and

consider seriously whether it was going to extend a line of credit to an individual with those

types of liabilities" A. "Yes." Ex. M. at 28:23-29:9); (7) that the bank never contemplated

that funds in the business account could be used to pay actual or perceived personal credit

card expenses ("Q. Let me ask, too. Later investigation indicated that a large amount of the

loan proceeds were used to pay what would ordinarily be thought of as personal expenses;

such as, personal credit card expenses of Chaka Fattah, Jr. Q. Was that within the

contemplation of the bank as it made the loan that personal expenses would be paid out of

these loan proceeds?" A. "No, sir" Ex. M at 29:20-30:4); (8) that the bank was unaware of

the credit card payments, luxury car payments, and was unaware that Fattah had made any

transactions at casinos. ("Juror: So when you guys were managing the loan, did you see

these, I guess, unusual charges? Someone had to be managing the loan at the bank, right? A.

"Yes, sir." Juror: And did anybody see these charges for his girlfriend's car and gambling and

stuff like that where — money from that loan was being used to pay for them?" A. "No, sir.

That is transparent to the bank unless someone writes a check payable to — I'm not sure of

who the — you know, what car or car manufacturer or if someone was writing a check made payable to a gambling casino or somethings like that. We would not know what the funds were being used for." "Juror: So it's not until after you found out that he misled you a little bit about what he was using those funds for?" A. "Well, again, it's all transparent to us. We would not know what someone is using loan proceeds for unless they were writing a check drawn on the account maintained at the bank in the name of that — whoever that payee may be; be it, a casino or —." "Q.(prosecutor) You didn't see any financial instrument to any other entities. A. "No, sir." Q. to raise any flags in your head? A. "No, sir" Juror: That's what I was getting at." Ex. M at 34:21-36:24); (9) that the bank did not have the opportunity to see how Fattah's business checking account transactions were handled over a period of time ("Q. So there really wasn't sort of a long-term period of time where the bank could be sort of monitoring 259 Strategies' expenditures out of its own account; was there?" A. "That is correct." Q. "This all happened fairly quickly?" A. "Yes, it did." Ex. M at 38:23-39:5); (10) continued to suggest that the bank only became aware of the credit card debt, car payments, and their typically being paid out of the business account due to the investigation ("Juror: Did he claim ignorance to the fact that he couldn't use that money for the things that he allegedly used — or that he did use it for? I mean did you ever tell him, hey, you know, you can't use this to pay off this car loan or you can't use this to go to Atlantic City?" Prosecutor: "Hold, on, Let's take a step back." "Q. Until you got involved with the FBI in the investigation, did you ever learn what this money was actually used for?" A. "No, sir." Q. "So you never had an opportunity to have any discussion with him about using the money at casinos, clothes, credit card, or any of that kind of stuff?" A. "No, sir." Q. "So you never had

an opportunity to have a discussion about this because you weren't aware of what he spent it on?" A. "That is correct" Juror: Did you ever tell him after when you went and tried to work it out? Did you say, hey, you weren't supposed to use this money for that? Q. The question is did you ever have a conversation with him where you became aware he was misusing the money. A. "No, sir." Prosecutor to Juror: "Your question assumes that [Braxton] learned everything that we talked about here in the Grand Jury about how the money went. Do you understand? Juror: I'm just trying to figure out. You guys are saying that he did something that was illegal, and I'm trying to figure out if he knew." Ex. M at 41:5-43:9); (11) that Fattah's credit report did not contain any other credit inquiries at the time it was obtained by the bank on March 30, 2011 ("Juror: Did it show any inquiries from other lenders during like maybe a three-month period prior? A. "I don't believe there were any inquiries either."); and (12) that it is very, very rare, very unusual for a business owner to write themselves a check for salary and then use the money, for personal expenses like any employee would, or that business owners often make payroll (an operating expense) with credit lines if funds are not otherwise available ("Juror. Is this like unique or does it happen a lot." A. "To my knowledge, this is something that is very, very rare, very unusual." Ex. M at 30:14-18). The vast majority of these statements are false, and in a few cases simply misleading.

First, the March 15, 2011 financial statement provided to the bank did, in fact, show $15,000 in credit card debt. *See* Exhibit N. ("Loans owing banks and others (from Schedule 8)", Schedule 8 states a heading "Loans Owing Banks, Brokers, Finance Companies and Others (Visa, MasterCard, etc.)") The financial statement shows "Nordstrom Visa" with a balance of "[$]5000", "Chase MasterCard" with a balance of "[$]5000", and "HSBC Premier

MasterCard" with a balance of "[$]5000". That is plainly a total of $15,000. *See* Ex. N at p.3.

Furthermore, the credit report United Bank obtained from Credit Plus on March 30, 2011,

weeks before the loan was approved, shows three credit cards with balances of "$6864",

"$4999", and "$3734". That is a total of $15,597. *See* Exhibit O. These documents were

obtained through the discovery process and their authenticity cannot be disputed. Not only

did the bank know, definitively, that Fattah owed $15,000 on his credit cards from the March

15, 2011 statement, the bank obtained a credit report prior to the issuance of the loan which

showed updated balances of slightly more debt. This plainly shows that Mr. Braxton's

testimony that "No, it does not" show $15,000 in credit card debt is a false declaration before

the grand jury, in violation of 18 U.S.C. § 1623. However, Mr. Braxton went further by

stating that the existence of the credit card debt which he claimed was not disclosed, may

have influenced the bank's decision. That is also a false declaration, since the bank had the

information prior to the issuance of the loan, it can only be that the bank considered the debt

and issued the loan anyway. Since Mr. Braxton, mischaracterizes the $15,000 in loans

showing on the financial statement, as something other than credit cards, that could

reasonably have led a juror to erroneously believe Fattah had both $15,000 in loans, and an

omitted $15,000 in credit card debt.

Mr. Braxton, at the very least, misled the jurors into believing that the bank had no

idea Fattah gambled, that is also not accurate. As part of the application process, Fattah had

to submit (3) months of business checking account statements to the bank. Fattah's business

checking account statement from HSBC Bank, shows (5) ATM withdrawals with a

description of "Cash Withdrawal at...Sugarhouse Casino", which total over $2,400. *See*

Exhibit P, p.2-3. Mr. Braxton told the grand jury he would "[a]bsolutely" be concerned about the charges "not being a legitimate business expense". The bank could have raised this issue as part of its due diligence, prior to issuing the loan, or not issued the loan at all, but failed to do so. Mr. Braxton previously told the FBI, nearly a year before his testimony at the grand jury, that he reviewed the loan application wherein due diligence was performed. (agent's memorandum). Mr. Braxton made a similar statement about the amount of work banks perform prior to issuing a loan, in terms of due diligence before the grand jury. Fattah similarly disclosed as part of the application process to the bank, regarding two other vehicles used for business purposes, that 259 Strategies LLC "leases two automobiles from its major customer…" that total thousands of dollars a month. Hence, United Bank was aware that Fattah typically made car payments, even though that references different automobiles.

Mr. Braxton's answer to the question regarding the IRS debt is false or misleading for three reasons. First, Fattah disclosed an IRS debt to the bank on or after March 16, 2011 by sending his 2010 tax return to the bank, which states as "Amount you owe" as $51,239. In fact, the bank's analysis did consider the IRS tax debt of $51,141 ($51,239 minus $98 est. tax penalty) prior to issuing the loan in April 2011. *See* Exhibit Q. Second, Fattah did not owe $86,735 to the IRS at any point in 2011. Third, Mr. Braxton, as a seasoned loan officer, is well aware that the personal financial statements at issue from March 15, 2011 and September, 30, 2011 reflect "assets and liabilities as of" the filing date. Mr. Braxton has more knowledge than the average individual regarding accounting, and these financial statements are basic balance sheets, which can be accurately described as a snapshot of an individual's

assets and liabilities on a given date, not before or after it. There is no basis whatsoever to suggest that because Fattah's financial situation deteriorated between March and September, that Fattah could have known his liabilities for September in March 2011, six months earlier.

Over $71,000 was deposited into Fattah's account in April and May 2011, not including the loan proceeds. Mr. Braxton's statement about $24,000 being paid to the line of credit is misleading in that it makes it appear to the grand jurors as though deposits that were consistent with the accounts receivable did not actually occur in April and May 2011. The bank did, in fact, only transfer approximately $24,000 to the line of credit. However, there was no interest payment due when approximately $31,809 was deposited a few days after the loan was approved, for example.

The (3) months of HSBC and Citizens bank statements given to United Bank as part of the application in March 2011 showed, on their face, car payments to "Audi" and "BMW" on the following dates: December 23, 2010; December 28, 2010, December 31, 2010; January 6, 2011; January 18, 2011; and February 25, 2011 (Exhibit Q). All of those payments were made out of the business account. Further, the same bank statements show $2,651 in credit card payments to "Chase" and "Nordstrom" credit card accounts on January 6, 2011, $3,500 to "BarclayCard" on January 10, 2011, and $983 to "Capital One". These payments were all made out of business checking accounts that were disclosed to United Bank as part of the loan application. That cannot be disputed. There was also a cash withdrawal of $11,806 on February 25, 2011. *See* Exhibit F. Fattah submits that the bank had information, which it reviewed extensively. There are no allegations Fattah was ever questioned about any line item on the bank statements given to United Bank, as to the purpose of the spending, or

otherwise. The statement by Mr. Braxton is false, if not simply misleading that the bank could not have "contemplated" that these expenses or patterns would continue.

Mr. Braxton also gave false and misleading testimony as it relates to his contact with Mr. Shulick. Even if Mr. Shulick had said "there is no contract", the bank and the USA clearly know there was one at the time of the loan application, and the term as written in that agreement was not scheduled to end until June 2012. This references the $450,000 259 Strategies LLC agreement dated October 2010. This gave the grand jury the false impression that the contract may have not actually been valid or authentic in March or April 2011.

A grand juror asked Mr. Braxton, as stated above, "And did anybody see these charges for his girlfriend's car and gambling and stuff like that were — money from that loan was being used to pay for them?". Mr. Braxton responded "No, sir. That is transparent to the bank unless someone writes a check payable to — I'm not sure of who the — you know, what car or car manufacturer or if someone was writing a check made payable to a gambling casino or somethings like that. We would not know what the funds were being used for." That is a clear false declaration. The car being referenced in the questions as Fattah's girlfriend's car was an Audi. The United Bank account statement says "Audi Fincl., Tel. Web Debit", transaction dated May 31, 2011. The credit card charges, referencing the $15,000 n the indictment, similarly show as "Nordstrom" (3), "Barclaycard" (2), "Chase" (*See* Exhibit R). False declarations about this issue span multiple questions, by grand jury members, prosecutors, all of which received the same false answer, said in a slightly different way by Mr. Braxton. These transactions are visible at the bank, similar to checks. Low level employees, such as customer service at a branch or phone support even can see these

charges, let alone a high level official such as Mr. Braxton. Mr. Braxton stated many different ways that the bank never had the "opportunity" to ask Fattah about his spending. For example, Q. "So you never had an opportunity to have a discussion about this because you weren't aware of what he spent it on?" A. "That is correct". The United Bank checking account statements also show a $404 withdrawal at "Sugarhouse Casino". This also shows the statement above about never having an opportunity to question Fattah about charges which are in their system is false. These transactions are viewed in the normal course of their business, and Mr. Braxton acknowledged they monitored Fattah's spending out of the account. Mr. Braxton had previously told the FBI in 2012 that as he understood it, the balance of the 259 Strategies payments, net of expenses, represented Fattah's salary. As Mr. Braxton knows, Fattah's salary, net of expenses, is entirely consistent with the two checks for $19,000 and $20,000 cited in the indictment (Count 12 at 7-9).  However, before the grand jury Mr. Braxton failed to acknowledge that it would be appropriate and legal for Fattah to use his salary for gambling or any other legitimate personal expense. Mr. Braxton also says that it is unusual for checks to be made out to the owner of a business from a business checking account. That is false, as many business owners, pay themselves from their business accounts. Otherwise, how would any active full-time business owner fund personal expenses such as rent, a birthday party, or christmas presents, unless they are independently wealthy, have savings or are running a passive enterprise. Fattah fully disclosed that this 259 Strategies LLC contract was his sole source of income and thereby his means to fund similar expenses. Mr. Braxton made a number of false declarations in the above questions, in violation of 18 U.S.C. § 1623. Fattah was prejudiced by Mr. Braxton's many false

declarations. The Indictment, as it relates to Count 12, clearly talks about the $15,000 in credit card debt and the car payment, prior to the two other transactions. Mr. Braxton, as is apparent in the discovery, is the only bank employee to discuss before the grand jury any conduct related to Fattah prior to the issuance of the loan at issue, in April 2011. Mr. Braxton responded that he did not see any financial instrument to other entities, which is simply false based on the documentation the bank themselves gave to the government. Mr. Braxton also presumably reviewed those documents prior to testifying to refresh his memory. Mr. Braxton stated falsely that Fattah's credit report did not show any other credit inquiries on March 30, 2011. There are, actually, two inquiries from Citizens Bank ("[citizensbk]" and "[citizenscc]" Ex. O. p.2). Mr. Braxton also gave a false impression that the bank had no access to historical financials for 259 Strategies LLC, as the bank had received accountant reviewed financials for the entire year of 2010. This type of financial documentation is a higher level of reliability than just relying on a business owner's internal or self generated financials, which Mr. Braxton knew at the time of his testimony. Fattah submits there are other false statements by Mr. Braxton as it relates to "working capital" and his interactions with Fattah prior to the issuance of the loan at issue in Count 12. Fattah submits that it is apparent not just in Mr. Braxton's responses to questions from the prosecutors, but in some cases because of his responses to clear lines of inquiry from grand jurors themselves as to elements of the offense. The alleged scheme to defraud clearly is about "obtaining" this line of credit. These falsehoods related to material events leading up to the issuance of the loan.  It cannot be disputed that line items such as "Audi", or "Nordstrom", or "Sugarhouse Casino" are viewable in United Bank's system, which Mr. Braxton had access to on any given business

day. In determining the answer to whether the grand jury was " 'substantially influenced the decision to indict or [whether] there is 'grave doubt' that the decision was free from the substantial influence of" improper evidence test in <u>Bank of Nova Scotia</u>, the Eleventh Circuit said "our task is to examine the state of mind of the grand jurors. . . our only source of evidence to find the ultimate constitutional fact, whether the grand jury was overborne— is the cold record of the grand jury proceedings. Specifically, we draw inferences from the words [the] AUSA [name] used, the testimony of witnesses who appeared before the grand jury, and the grand juror's questions." <u>United States v. Sigma</u>, 196 F.3d 1314 (11th Cir. 1999) (p.53). <u>See</u> <u>also</u> <u>Stirone v. United States</u>, 361 U.S. 212 (1960) ("the very purpose of the requirement that a man be indicted by a grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."); <u>United States v. McKenzie</u>, 678 F.2d 629, 631 (5th Cir.1982) (Holding that an indictment may be dismissed "when prosecutorial misconduct amounts to overbearing the will of the grand jury so that the indictment is, in effect, that of the prosecutor rather than the grand jury"). The present matter is such an instance when "prosecutorial misconduct amounts to overbearing the will of the grand jury so that the indictment is, in effect, that of the prosecutor rather than the grand jury" <u>Mckenzie</u>.

Fattah has demonstrated actual prejudice due to Mr. Braxton's false testimony before the grand jury. Fattah submits he has met the first prong of the perjury and prosecutorial misconduct analysis. As it relates to the second prong of prosecutorial misconduct, see below.

In <u>United States v. Lawson</u>, 502 F. Supp. 158 (D. Md. 1980), the court held that "in the absence of a sufficient government explanation, the court finds the prosecutor's questions to Sampson were deliberately misleading and calculated to create a false impression on the grand jury." <u>Id.</u> at 163. Based on this, among other improprieties, the court dismissed the indictment, finding that the prosecutor had denied Lawson's constitutional right to an 'unbiased' grand jury. This is not a case where the two prosecutors corrected or pointed out falsehoods which they were, or should have been, knowledgeable about. <u>See</u> <u>also</u> <u>United States v. Basurto</u>, 497 F.2d 781 (9th Cir. 1974) (due process violated where government knew indictment was based on perjured testimony) (trial on such an indictment failed to comport with the "fastidious regard for the honor of the administration of justice." <u>Id.</u> at 787. "An important function of our supervisory power is to guarantee that federal prosecutors act with due regard for the integrity of the administration of justice. <u>Id.</u> at 793.) In affirming the dismissal of an indictment, the Ninth Circuit said "[a]lthough deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's role." <u>United States v. Samango</u>, 607 F.2d 877 (1979). Fattah submits this is a case of "deliberate introduction of perjured testimony".

The United Bank checking account statements have been in the government's possession since April 20, 2012, when the bank responded to a subpoena from the USA (Exhibit S). The personal financial statement dated March 15, 2011 (Exhibit N) was in the United States's possession prior to Mr. Braxton's testimony, and appears to be referenced multiple times during his testimony, some of which it seems he is looking directly at the

document, while making the false statement to the grand jury. The HSBC and Citizens Bank statements, submitted to United Bank as part of the loan application process in March 2011, were also in the United States possession prior to Mr. Braxton's testimony. Mr. Braxton, was interviewed by the FBI, and IRS, as early as July 12, 2012, nearly a year before his grand jury testimony. It is apparent from the transcript Mr. Braxton's that he and the prosecutors discussed his testimony prior to entering the grand jury. (Prosecutor: "as you told us outside…" Ex. M. at 16:19.) These facts cannot be disputed. The government cannot claim this error is harmless or that they had no knowledge of the above facts. Also, by saying "as you told us outside" it may have given the impression to the jury that the Mr. Braxton was telling the truth, namely by suggesting that his testimony is consistent with the unsworn conversation in the hallway. This may constitute vouching, to enhance the credibility of Mr. Braxton.

The prosecution played a key role in shaping Mr. Braxton's false testimony, as they determined which questions to ask, when to interrupt grand juror questioning, and this is clear from the questions and responses, and looking at the overall tone of the above questions and answers from the transcript. This is not a case where a grand jury witness lied or misled the jurors, and the prosecutor brought them back to the mark to clarify so they could answer the question truthfully. In cases such as those, Courts have denied motions to dismiss the indictment ("Even assuming the detective's testimony before the grand jury went too far, any misstep by the detective in his testimony was corrected by the prosecutor" Compare Goodrich v. Hall, 448 F.3d 45, 50 (1st Cir. 2006)). The prosecution spoke with Mr. Braxton outside the jury room about their line of questioning, then proceeded to ask questions that are

clearly intended to mislead the grand jury. The questions could have reasonably led the grand jury to believe that Fattah did not inform the bank of his credit card debt or car payment practices, and that the bank never had the "opportunity" to know about it, and that the bank was unaware of the car payments and credit card payments which were directly visible on the bank statements and their system on a daily basis. That is false and clearly shown by the attached exhibits. The government had this information for a significant period of time prior to Mr. Braxton's testimony. It is reasonable to assume that the prosecution team reviewed the financial statements, bank statements, and documents that were submitted with the loan application prior to Mr. Braxton's testimony.

The prosecutors questions start with establishing that Fattah did not tell the bank about his credit card debt at all, which was not true. This was contrary to documents the prosecutor had in their possession. Then they asked whether that could have affected the bank's decision, which they knew was not true because it was disclosed and the bank did not deny the loan in this case. The prosecutors are well aware that Fattah never owed $86,735 in 2011 to the IRS, yet they asked Mr. Braxton whether that could have affected the decision, which may have reasonably led grand jurors to believe Fattah was under an obligation to report that amount at the time of the loan application, and if he had done so that the loan may not have been approved. The prosecutors were also aware that it would be impossible for any individual, including Fattah, to have known that they would find themselves in more debt six months later. The prosecutors question suggests to the grand jury that Fattah made false statements on the personal financial statement in March 2011, and that the bank may not have extended credit to Fattah if he had been truthful. Again, this is referencing a financial

position of assets and liabilities six months after the loan was obtained. ("Q. Would that have caused the bank to pause and consider seriously whether it was going to extend a line of credit to an individual with those types of liabilities" A. "Yes." Ex. M. at 28:23-29:9). In United States v. Soberon, 929 F.2d 935 (3d Cir. 1991), a footnote says "According to the district judge, if the attorney was aware of the discrepancy, he committed prosecutorial misconduct by using the testimony. If he was unaware of the discrepancy, he committed prosecutorial misconduct by not discovering it." In that matter, the district court's ruling dismissing an indictment was reversed for other reasons.

When the grand jurors asked questions to inquire about whether the bank, which had acknowledged it communicated with Fattah a few times, whether Fattah was asked about credit card payments, car payments, or other expenses, the prosecutor suggested that they were wrong. For example, one such comment was: Q. "Your question assumes that [Braxton] learned everything that we talked about here in the Grand Jury about how the money went. Do you understand?". The prosecutor testified himself in that instance, instead of allowing Mr. Braxton to answer the question posed to him. Mr. Braxton was asked multiple questions, so he could either repeat or tell the falsehoods in many ways. When the prosecutor says "Hold on, let's take a step back" it suggests to the grand jury that the line of questioning is against the prosecutors wishes, even though the questions directly relate to whether there was a scheme to defraud, an element of the bank fraud charge in count 12. In United States v. Samango, 607 F.2d 883, the Ninth Circuit said the "[grand jury] transcript consisted of testimony given nearly two years earlier . . .Since his testimony was in written form, the prosecutor knew before he presented it exactly what it contained." In the present matter, even

if Mr. Braxton's false declaration were not recognized at the time of his testimony in June 2013, they surely could have been reviewed prior to July 15, 2014, when the jury was clearly told the entire grand jury transcripts in this matter were available for review. Essentially, the prosecutor invited the grand jurors to review the transcripts, which contained Mr. Braxton's perjured testimony. Prosecutors, aware of the facts, did not take any steps to correct Mr. Braxton's testimony. Mr. Braxton's deceptive and misleading testimony was designed to influence the grand jury, and the leading questions by the prosecutors served to enhance the false declarations. The grand jurors questions were clearly interested in the bank's own actions taken as part of the application process, and after the loan was issued in monitoring Fattah's business checking account. The purpose of Mr. Braxton's false statements was to mislead the grand jurors about key aspects of the bank's decision to offer the loan to Fattah, and their ability to monitor the funds after the loan was issued.

Finally, FBI Agent Haag gave testimony on July 15, 2014 before the grand jury regarding count 12. The prosecutor asked "Am I correct that Mr. Braxton and Norman Greene testified that Mr. Fattah told them that he would use the funds for his 259 Strategies account to pay employees to whom he had to make payments before he was paid by Delaware Valley High School to make those payments. So this is kind of a Gap Fund?", to which Agent Haag responded "Correct." This is false or misleading hearsay testimony. First, Norman Greene did not testify that Fattah told him anything prior to the loan being approved, and as his testimony says he had no interactions with Fattah prior to the loan being approved. Second, Mr. Braxton did not use the words gap fund. Mr. Braxton also did not say that he was told the funds would be used only to "pay employees". If this testimony is not a false

declaration, it is clearly misleading. The grand jury clearly considered this false statement by Agent Haag in their returning the Indictment (See Indictment, Count 12, p.19 "gap…had to make payments to the employees before Company 1…").

### G. Agent Haag and School District Attorney Mr. McCarthy Grand Jury Testimony Contained False Declarations, In Violation of 18 U.S.C. § 1623

On the day the Indictment was returned (and sealed), July 29, 2014, Agent Haag falsely testified as it relates to the wire fraud counts. Agent Haag told the grand jury that the 259 Strategies LLC contract for $450,000 was outstanding when the budgets in count 20-21 were allegedly sent ("Q. All right. Agent Haag, first, in preparing the proposed indictment, am I correct, that we would propose some wire fraud counts concerning Chaka Fattah, Jr.?" A. "Correct". "Q. And we asked you to look to determine if after Fattah, Jr. and Shulick supplied the Philadelphia School District with what we allege are false budgets for the Southwest School whether Fattah, Jr. received financial benefits from his employer Unique Educational Experience doing business out of Delaware Valley High School." A. "Correct". "Q. And in our proposed indictment on the last page in Counts 22 and 23 we have identified two wire transmission or you have identified them for the Grand Jurors. Can you explain what those two transmissions are?" A. "They are wires from Unique Educational Experience which does business as Delaware Valley High School's operating account at RBS Citizens Bank in Providence, Rhode Island to 259 Strategies which is Fattah Jr.'s company at United Bank in Philadelphia, and they are payments for — pursuant to Fattah Jr.'s contract with DVHS." "Q. And that contract was outstanding at the time period that DVHS had contracted with the Philadelphia School District to operate the Southwest School and submitted their

budgets for that purpose;is that correct?" A. "Correct" (Haag Testimony July 29, 2014 at
2:11-3:19). That last statement is false, the contract was not "outstanding" at the time the
budget was allegedly sent, as it relates to count 20. The $450,000 contract, which is the
contract the payments in 22-23 were made "pursuant to", was not signed until October 6,
2010, approximately 9 days after the budget in Counts 19-20 was allegedly sent. As it relates
to Count 21, the answer is misleading because as the United States knows, Fattah did not
receive any payments under that contract pursuant to the second school year, to which that
budget relates. In addition, the prosecutor and FBI Agent knew at the time that Delaware
Valley High School was not Fattah's employer.

      Agent Haag also told the grand jury that Fattah was not eligible to received $50,000
(or $100,000) by way of the minority business contract from funds taken from Southwest as
far as his payment to be made by Delaware Valley High School from a general administrator
fund and suggested there was something inappropriate about payments to Mr. Kaye and Mr.
Jubilirer ("Q. Was Fattah eligible to receive $50,000 by way of the minority business
contract from funds taken from Southwest as far as his payment to be made by Delaware
Valley High School from a general administrator fund?" A. "There is no notation indicating
that Mr. Fattah, Jr. should be paid for services rendered on the Southwest contract. And if Mr.
Shulick wanted to pay him additional funds, he was entitled to do so using general DVHS
funds, but it shouldn't have been billed to the Southwest contract." Haag Testimony July 29,
2014 at 64:5-16). That declaration is false. First, the Southwest contracts as mentioned in
referenced in counts 19-23 incorporate all the terms of RFP 233, even though these contracts
were issued after the original selection of vendors under that contract. RFP 233 is 205 pages,

and the minority participation range for the contract is 10-15%. The contract was $1,055,800 for year 1 and $1,040,200 for year 2. The participation minimum would have been $105,580 and $104,020 respectively. Agent Haag's statement is false and designed to have the grand jury believe that Fattah was not eligible for the additional $50,000 or more from the contract. Second, the payments to Fattah's company were not billed to the school district (Ex. T). On its face, the invoices bill the school district for educational services provided to students enrolled in the program. In fact, School District attorney testified "That's correct" in response to whether "[t]he school district contracts contains this minority requirement" McCarthy Testimony 14:3-5. The attorney also said the minority requirement is "something which the School District and which the [School Reform] Commission cares about" McCarthy Testimony 13:23-25.

    Agent Haag and the United States misled the grand jury regarding the importance of the budgets to Delaware Valley High School's relationship with the Philadelphia School District. For instance, they did not mention that significant expenses for Southwest totaling hundreds of thousands of dollars that do not appear anywhere on the budget. The United States does not tell the grand jury of the emergency nature of the awarding of DVHS's contract as it relates to counts 19-21 and the reason for the amendment in counts 19 & 21. The Amendment was done because the Philadelphia School District had budget problems and reduced everyone's contracts. The United States also misleads the grand jurors to believe that the budgets are the equivalent of invoices. The United States and Agent Haag were aware that that approximately 21 invoices were sent to the Philadelphia School District in 2010-2012, related to the budgets in counts 19-21, and none of them contain one word or

reference about the budget. The invoices for services (Ex. T) under the Southwest Agreement for Services and later the Amendment to the Agreement for Services show the basis for all payments made by the Philadelphia School District is the monthly fee per student ($527.90 in year 1, $520.10 in year 2) multiplied by the number of students (typically 200) is how the payments are calculated. The grand jury was led to believe that payments were made based on the budgets, and not the invoices. Of course, all the check amounts come from the "Total Due" on the invoices (Exhibit T).

Agent Haag misled the grand jury about the amount of work done by Fattah related to Southwest ("Q. And has your investigation showed that Fattah, Jr. was working at Southwest School during the time of the contract or at the headquarters of DVHS?" A. "Primarily he was working at DVHS' headquarters in Center City". (Haag Testimony July 15, 2014 64:17-22). Agent Haag knows from emails and other evidence that Fattah held primary responsibility in summer 2011 for opening the school on time. This includes choosing and overseeing vendors totaling an estimated $200,000, and spending significant time at Southwest during July-September 2011.

Philadelphia School District Attorney Paul McCarthy made false declarations before the grand jury during his testimony on July 16, 2013. The grand jury was misled into believing that a response to the Request for Proposal was developed for Southwest, when the contract was awarded without any proposal at all in July 2010. Email and other documentation in the United States possession shows this. ("Q. Just explain a little bit to the Grand Jurors, when you put out the Request for Proposal, I assume the Request identifies what it is that you want people to answer to?" A. "Sure" "Q. They submit a proposal which

outlines in detail what they're going to do, including budgets and that type of thing." A. "Absolutely. You give them as much specificity as you can so they've got something concrete to respond to. My recollection of RFP-233 was about a two hundred-page document. It probably had a forty-paged specification; maybe five or eight pages on Transition; five or eight pages on Accelerated and some general administrative stuff. We ask for a staffing plan. We also ask for a program budget to back up the economics. So, you make a proposal that shows what type of curriculum you have; what are you social service supports what does the administration of the program look like; a staff plan. In this case we called for community relationships which were other social service agency supports which could buttress the program, which would be including additional financial support beyond what the School District can bring to the table to fund the program." McCarthy Testimony 9:22-11:1). The prosecutors then suggest that any proposal or budget sent was responding to RFP 233, in other words, it was part of a request to ask the district to do business with DVHS. ("Q. Okay. That was also let out under the same Request for Proposal, 233, and they responded with proposals and budgets and that type of thing?" A. "More or less, that's correct").

Further, the prosecutor asked "When Ms. Scott was here shortly she gave an example of — she identified some of the e-mails where she had sent out a standard budget to Delaware Valley High School when they were thinking about making a proposal for the Southwest School. We've gone over the contract with you and you've seen the budget. Why does the School District require a vendor to supply a sample budget with how they intend to spend the School District's money if they are accepted as a vendor[sic]?" A. "It's a tool for

verifying that they know what they're doing. They're promising to provide us with a particular program that's going to require a certain number of teachers, and teachers who are going to require a certain amount of administrative support. There's a social service component to it. My clients, the Program Managers at the School District, have a sense of what ought to be a reasonable cost for a school teacher or for some of the administrative components. It's a chance to see what they've propose to use on paper makes sense when it's put to work in the field. It's a chance to verify that the economics of the relationship as the vendor[sic] perceived it makes sense to us." McCarthy Testimony 15:15-16:17. Most, if not all of that statement is false, but first the question is misleading and contrary to the facts as the prosecutor and Mr. McCarthy knew them at the time of his testimony (and years before it). The prosecutor said "[Ms. Scott] identified some of the e-mails where she had sent out a standard budget to Delaware Valley High School when they were thinking about making a proposal for the Southwest School". That is inaccurate based on the email itself. The email, from Ms. Scott with the sample budget was sent on September 22, 2010. The response was sent, according to the Indictment, on September 27, 2010.

First, the Southwest School opened for students on September 7, 2010 (Philadelphia School District Academic Calendar 2010-2011 "First day of Grades 1-12 Pupil Attendance" http://www.philasd.org/calendar/2010_2011/ last accessed December 1, 2014). Hence, Delaware Valley High School was not "thinking about making a proposal for the Southwest School" on September 22, 2012, when Ms. Scott sent the sample budget. In fact, the email itself says "I totally overlooked the budget piece". This shows it was, in fact, the School District which did not even tell Delaware Valley High School it needed a budget until that

date (well after hundreds of thousands of dollars had been spent). Ms. Scott goes on to say "My apologies for overlooking this piece. Get it to me as soon as you can". Second, it is again a mischaracterization for the prosecutor to say Delaware Valley High School was "thinking about making a proposal" for more reasons. Delaware Valley High School was given keys to the building by the Philadelphia School District on August 20, 2010. This is more than 30 days before the email about the budget. The contract was negotiated between the parties in July/August 2010 and sent back to the District executed by "Mr. Shulick" at Delaware Valley High School. The contract, as stated in the Indictment, was executed and delivered as of July 1, 2010. The grand jury was misled into believing that the District was deceived in a proposal, in other words, a document before business takes place between parties. In this case, as the prosecutor and Mr. McCarthy knew, the District itself did not realize the budget was necessary. Mr. McCarthy's response is false in the sense that it may have some applicability in cases where the School District goes through the RFP process to select a vendor. It also could be applicable when the School District is deciding whether or not to do business with someone. In this case, his answer is false and misleading. Mr. McCarthy negotiated the contract in July/August 2010 with Mr. Shulick after the District chose Delaware Valley High School at a meeting, without any proposal or budget. Numerous people attended this meeting including Fattah and Mr. Shulick, other competitors and School District personnel. Several government witnesses, and people who testified before the grand jury are knowledgable about this fact, and so is the government. The School District of Philadelphia gave Delaware Valley High School the contract without the normal process, because another vendor was not performing. The School District then gave Delaware Valley

High School full access to the property on August 20, 2010. District personnel were aware that the school opened and likely had staff visit the school prior to any budget being sent. Mr. McCarthy's response is false and misleading even more as it relates to the second budget, as referenced in count 19 and 21. The second budget was sent, not so the District could evaluate anything, but because the School District asked Delaware Valley High School to reduce its contract by approximately $15,000, and the school agreed to do so. The District, as of July 2011, had conducted numerous site visits and written reports on the quality of the educational program provided by Delaware Valley High School at the Southwest location. The number of teachers, lack of counselor, number of security guards, and the perceived quality of teachers who were allegedly paid less are all things that the School District themselves evaluated. District personnel rated the Delaware Valley High School Southwest program as either the top accelerated program or the second best (based on memory), and Philadelphia School District documentation and emails the United States has in its possession show that. The suggestion that the second year budget was sent for the purpose of evaluating the staff or economics of the program is incredible and not consistent with reality. The grand jurors were deceived in other ways during the rest of Mr. McCarthy's testimony about the importance of the budgets.

Mr. McCarthy then, in response to questions by the prosecutors, suggest that the School District was without the resources to audit the school or ascertain the actual money spent by Delaware Valley High School ("Q. After Delaware Valley High School was accepted as the vendor[sic] at Kelly Drive does anybody do audits by the School District to check up on them to see whether they spent the money the way they said their budget was

66

going to spend it or that type of thing?" A. "The School District has an auditing services unit. It's small. It's understaffed. By way of general background, we generate on the order of eight hundred professional services contract a year. That doesn't even count the construction contracts. That unit does a pretty noble job of trying to get out and audit and sustain the integrity that comes from a good audit system but we don't have enough auditors. We would do so if we could. We should have more. We simply don't. But, yes, in concept, yes, we audit as much as we think is professionally appropriate under the circumstance." "Q. I don't know, but I assume that perhaps those audits are done where it appears in particular instances that an audit is necessary?" A. "Yes." "Q. So, there is no audit of every single contractor; it's impossible?" A. "That's correct. That's correct. Out auditors find problems and they report and they get them resolved." McCarthy Testimony 20:9-21:12). First, again Delaware Valley High School was accepted, or rather chosen, as the vendor for Southwest in July 2010. Mr. McCarthy himself participated in emails, phone calls, and/or meetings with Mr. Shulick to agree to the language in the contract. Then, the District was provided with a signed copy of the Agreement. Months later, the District sent an email asking for a budget. This is after the school is open, and resources have been spent. While it is likely true that the District has a small audit staff, Mr. McCarthy's responses and the questions are misleading. The District had personnel on scheduled and unscheduled visits to the Southwest School on a regular basis. The District produced written reports related to those visits, which, in part, measure teacher quality, behavior, and other issues. The District was well aware of the number of staff working at the location, as they went there often. The only thing the visits could not determine were specific salaries, or benefit costs. However, the emphasis in these questions

led the grand jury to believe that the only way the District would have known the exact amount spent on staff or benefits could only be determined by an audit. In fact, the District at any time, could have asked separate from the budget for a copy of the school's benefit policy, or specific payroll records. Of course, the District did not ever ask for that information. This is even more serious regarding year 2 because the District had already determined that they liked the program so much they wanted to continue for year 2, when they had the option to cancel the contract if they were unhappy with the amount of teachers, amount of security guards, quality or perceived quality of the principal or director, lack of counselor, or any other issue except for the exact costs of the staff positions or benefits.

Finally, the grand jury asked questions about the success of the program and whether there were any reports showing that success ("Juror. Is there any general statistical reports provided in terms of success of the program; retention? You have kids who have challenges. Do they give you a general summary saying, hey, we have "X" amount of kids coming into the program? Do you get a summary from them?" A. "Yes. The contract itself has a section on accountability. It also has a table kind of buried in the exhibits called a Performance Matrix which in this generation of the contract it listed about thirteen different factors which were pretty much amenable to statistical measuring. It includes things like the scores the kids get on PSSAs. We look at that. We care about that. There were contractual consequences to that it you were statistically underperforming. It didn't affect DVHS, but one of the other contractors in the portfolio for the first year, we felt they were consistently underperforming. Attendance is a primary drive. It's a primary measure of whether the kids are engaged in the program. We have taken contractual action. We've terminated contracts where the vendors

weren't performing well enough. So, yes, we're very attentive to that School Reform Commission. It cares about that. We try to be pretty good using the numbers." McCarthy Testimony at 21:15-22:20). Further, the grand jury asked, referencing the original RFP in 2008 related to another school location ("Juror. Was there any fraudulent activity found with the Delaware Valley High School?" A. "Fraudulent activity?" "Juror. Yes.")("Q. (prosecutor) You didn't do any independent investigation to determine whether there was any fraud here? A. "That's correct" "Q. You participated in the FBI's investigation of that. Correct?" A. "That's correct. The program site monitors — it wouldn't be for fraud or audit or anything like that. The Alt Ed Unit keeps an eye on how people are doing. They are aware of whether there are operational issues. It's either — contract administration is one term for it. The other term is Program Monitoring. The Alt Ed Unit, my sen is they're pretty on top of all of their contractors. They're aware if the neighbors are complaining about kids at DVHS. They keep an eye on issues like that. They're pretty responsive. They keep an eye on our vendors and our kids." "Q. As you've already testified, you have not done any audit and you have not done any independent investigation to determine whether Delaware Valley spent the money that they said their budgets were going to spend on your schools?" A. "That's correct" (McCarthy Testimony at 25:25-27:2). The testimony is false and misleading, as are the questions. Fattah is alleged in the Indictment in counts 19-23 that the budgets have, in part, "salary figures for non-existent employees, such as a computer lab technician, a behavior specialist, and youth service assistants". Mr. McCarthy's response suggests that the Alt Ed Unit, which does regular scheduled and unscheduled visits, could not have known that employees did not exist. The School District, according to the United States, relied on the

budgets sent in count 19-23 to determine that the company "had proper administrative and teaching personnel and the practical economics in place to carry out the contracts successfully". The truth is much more simple. The District, as it relates to the September 27, 2010, budget, sent employees from the Alternative Education Unit to the Southwest School on a regular basis. The amount of teachers, security personnel, computer lab technicians, and the total staffing level that would be obvious and common sense to any professional taking a tour of the entire program pursuant to evaluating the program's performance. Further, the District determined, based on a full year of results, including attendance, graduations, and academic performance guidelines that it would continue for year 2, as it related to the July 13, 2011 budget, albeit at a reduced cost. The District contacted DVHS at the very least on a monthly basis and had every opportunity to verify the numbers if it asked for information other than the alleged budgets. In fact, if the District did not reduce the contract amount for year two, there never even would have been a second email.

Mr. McCarthy and Agent Haag's false declarations and misleading testimony prejudiced Fattah before the grand jury. Several elements of wire fraud are implicated by their statements, such as, the existence of a scheme to defraud or to obtain money, the intent to defraud, and the use of wire transmissions in furtherance of the scheme. The same is true for the elements of theft of government funds as it relates to whether money was stolen or obtained by fraud from the Philadelphia School District.

The true nature of when the School District entered into an agreement with Delaware Valley High School, whether or not the September 27, 2010 email was a proposal for DVHS to take over a program (when it was, in fact, already operating the program), and whether or

not the District was aware of the exact staffing levels are all material. The contracts were negotiated and agreed to before the budgets were sent. Agent Haag said before the grand jury on April, 2013 that "some of the budgets that were submitted to the School District in order to get these contracts…" (Haag Testimony April 30, 2013 at 12:18-21). The United States knew that was not true.

### H.   The United States Violated Fattah's Right to Due Process and Improperly Mixed Two Purported Parallel Investigations By The Philadelphia School District and the Small Business Administration To Obtain Evidence For This Criminal Proceeding Based On the Same Facts

In 2011, Fattah's college roommate contacted him from the FBI Philadelphia Office as part of this criminal investigation, unbeknownst to Fattah, and as part of the conversation they discussed briefly Mr. Amato's bankruptcy, which had been filed nearly 4 years prior to that date. Mr. Amato initiated the discussion by calling Fattah. Mr. Amato told Fattah he was "waiting for the discharge" and someone associated with the bankruptcy case kept calling him about an SBA loan. Fattah said if Mr. Amato told them to call him or gave him the number he would contact them. Mr. Amato was working with the FBI. Later, Mr. Amato gave Fattah the business card of SBA Special Agent Michael Moffa. Fattah later spoke with Agent Moffa on or about May 20, 2011 (Indictment, count 10). Fattah submits that the Small Business Administration improperly worked with the FBI as part of their criminal investigation. The SBA investigation was not a legitimate, parallel investigation.

Fattah was not given any notice that what he told Agent Moffa could be used in a criminal proceeding against him. Fattah was not advised of his rights. Also, the questions Mr.

Moffa asked cover more than loans that were issued with SBA guarantees. Agent Moffa told Fattah that "the nature of the phone call is basically stemmed from like an audit report." Fattah was never provided a copy of this purported audit report. Fattah notes that Mr. Amato never took out an SBA loan, and that no loan to the trade name Chaka Fattah Jr. & Associates was guaranteed by the SBA. There would be no basis for Agent Moffa to ask Amato anything about non-SBA loans. However, Agent Moffa asked Fattah questions about Mr. Amato and his non-SBA loans. For instance, Agent Moffa asked "Okay now I mean just going back to the loans with Mr. Amato. The part of the confusion on my part and maybe you can clear this up is the loans for him were taken out in Chaka Fattah Jr. & Associates" followed by "What is that company?". The SBA does not have any authority under the law to investigate loans not guaranteed by them, but Agent Moffa asked Fattah questions about loans not guaranteed by the SBA. Fattah submits that the SBA provides financial assistance, contractual assistance and business development assistance. None of those functions cover investigations into loans without any SBA connection. Fattah submits that the SBA was not actually conducting a civil investigation into the three SBA guaranteed loans issued to Fattah, two of which had been settled, but was working with the FBI to get Fattah to make recorded statements that could be used against him at this current criminal trial. Fattah submits that the evidence was obtained improperly as a departure from the proper administration of criminal justice.

In United States v. Scrushy, 366 F.Supp.2d 1134 (N.D. Ala. 2005), the Court granted a motion to suppress an S.E.C. deposition, and because of the suppression dismissed the perjury counts based on that deposition with prejudice. The Court held, that "before this court is whether the Government departed from the proper administration of criminal justice

in procuring the Defendant's deposition testimony. The court finds that the Government

clearly so departed. The civil action and the criminal investigation improperly merged on

March 12, 2003, when the U.S. Attorney's office called the S.E.C. office, gave the S.E.C.

advice or "preferences" regarding the content of the deposition and its location, and recruited

Neil Seiden to participate in the interviews of Bill Owens and Weston Smith in the criminal

investigation". The Court said "Federal courts have supervisory authority over the manner in

which Federal agents exercise their power. (citing Rea v. United States, 350 U.S. 214, 217,

76 S.Ct. 292, 100 L.Ed. 233 (1956); United States v. Parrott, 248 F.Supp. 196, 199 (D.D.C.

1965)) (However, a defendant cannot succeed on a theory of a "perjury trap" when the

questions related to a legitimate, parallel investigation. United States v. Waldon, 363 F.3d

1103, 1112-13 (11th Cir. 2004), cert denied, ___ U.S. ___, 125 S.Ct. 208, 160 L.Ed.2d 112

(2004). Further, the Court noted that the most analogous Eleventh Circuit case is United

States v. Handley, 763 F.2d 1401, 1403 (11th Cir. 1985). In Handley, the Eleventh Circuit

reversed the exclusion of the deposition testimony obtained in a civil matter, because "[t]he

government had no advance notice of any of the depositions and no input into their conduct."

The Scrushy Court said "[i]n the instant case, the Government had both notice and direct

input. Mr. Seiden received explicit directions from the U.S. Attorney's office concerning

tailoring his examination of Mr. Scrushy. He was told areas to avoid to keep Mr. Scrushy in

the dark regarding the criminal investigation, and Mr. Seiden specifically included questions

in the examination that he would not have included had the U.S. Attorney's office not

contacted the S.E.C. and discussed the criminal investigation." The government had asserted

that the civil testimony should not be suppressed because the taking of the civil deposition

could not be imputed to law enforcement. The Court noted actions such as "…extending the length of the deposition, and asking additional questions that otherwise would not have been asked after learning of the criminal investigation are properly imputed to the Government for purposes of this motion."  <u>Scrushy</u>, 366 F.Supp.2d 1139. Further, "[d]espite the government's assertion that the S.E.C. civil investigation was separate from and parallel to the Justice Department's criminal investigation, the facts belie that assertion. To be parallel, by definition, the separate investigation should be like the side-by-side train tracks that never intersect. By contrast, as of March 12, 2003 at 3:30 p.m., the S.E.C. civil investigation merged with the Justice Department criminal investigation." Fattah asserts that the SBA Investigation was not a "separate investigation" which "should be like the side-by-side train tracks that never intersect." Fattah notes that the SBA used an individual working as part of the Department of Justice criminal investigation, as of May 4, 2011. Fattah submits that on that date the SBA investigation ceased being a parallel investigation, if there ever was one. This was not an accident. The investigations were not parallel but were inescapably intertwined.

In <u>Scrushy</u>, the Government argued that Mr. Scrushy's S.E.C. testimony did not trigger any Fifth or Sixth Amendment rights. The Court determined allowing the Government to use the deposition would, based on the Governments actions "depart from the proper administration of criminal justice". The Court noted that "[w]hen a defendant knows that he has been charged with a crime, or that a criminal investigation has targeted him, he can take actions to prevent the providing of information in an administrative or civil proceeding that could later be used against him in the criminal case. When a defendant does

not know about the criminal investigation, the danger of prejudice increases. Parrots 248 F.Supp. at 200." The Court said the "interrelationship of the criminal and civil investigations formed a major component of Judge Johnson's opinion in Securities and Exchange Commission v. Healthsouth Corp., 261 F.Supp.2d 1298 (N.D.Ala.2003) Judge Johnson specifically found that "[b]ecause this is a case where the government has undoubtedly manipulated simultaneous criminal and civil proceedings, both of which it controls, 'there is a special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominally civil means. In that special situation the risk to individuals' constitutional rights is arguably magnified'. Sterling National Bank, 175 F.Supp.2d [573] at 579." [The Judge] also found that the two cases "overlap completely" and that the "issues in both are identical". Finally, the Scrushy Court said "The Government cannot have it both ways. Either some of the matter of the criminal investigation did overlap with the civil investigation OR the questions that Mr. Seiden testified he asked Mr. Scrushy based on the information he learned in the March 12th conversation were improper. The court agrees with the conclusion expressed by Judge Johnson: as of March 12, 2003, the S.E.C. civil investigation became inescapably intertwined with the criminal investigation conducted by the Department of Justice and Mr. Seiden of the S.E.C. This commingling on March 12, 2003, negated the existence of parallel investigations. Because the Government manipulated the simultaneous investigations for its own purposes, including the transfer of Mr. Scrushy's deposition in this case the court finds that the utilization of Mr. Scrushy's deposition in this case departs from the proper administration of justice. Therefore, the S.E.C. testimony must be excluded." Id. at 366

F.Supp.2d 1140. Fattah submits that because the SBA civil investigation was "inescapably intertwined" and "commingled" with the Department of Justice criminal investigation as of May 4, 2011, the transcript and tape recordings should be excluded.

In United States v. Kordel, 397 U.S. 11, 12, the Supreme Court indicated when a party has "made out either a violation of due process or a departure from proper standards in the administration of justice requiring the exercise of our supervisory power". The Supreme Court said "[w]e do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution (citing Cf. United States v. Procter & Gamble Co., 356 U.S. 677, 356 U.S. 683-64; United States v. Pennwalt Chemicals Corp., 260 F.Supp 171, and see United States v. Thayer, 214 F.Supp. 929; Beard v. New York Central R. Co., 20 F.R.D. 607), or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution (citing See Smith v. Katzenbach, 122 U.S.App.D.C. 113, 114-116, 351 F.2d 810, 811-813; United States v. Lipshitz, 132 F.Supp. 519, 523; United States v. Guerrina, 112 F.Supp. 126, 128); nor with a case where the defendant is without counsel (Cf. Nelson v. United States, 93 U.S.App.D.C. 14, 19, 21, and n.19, 208 F.2d 505, 510, 512, and n.19, cert denied, 346 U.S. 827) or reasonably fears prejudice from pretrial publicity or other unfair injury (Cf. United States v. American Radiator & Standard Sanitary Corp., 388 F.2d 201, 204-205, cert denied, 390 U.S. 922); nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution." Id. at 397 U.S. 12. Fattah submits that he was not advised during the SBA investigation that "it contemplate[d] his criminal prosecution", the SBA investigation was brought "solely to obtain evidence for" the Department of Justice

criminal prosecution and Fattah was "without counsel" under Kordel. This Court should

issue a discovery order regarding all communications between SBA Special Agent Moffa and

the FBI regarding this matter prior to May 20, 2011, the date of the alleged false statements.

However, the SBA investigation is only one of the purported parallel investigations the

United States used to obtain evidence in this matter. Fattah requests that the Court exclude

the SBA statements on May 20, 2011 as involuntary under the Due Process clause.

Fattah requests that the Court determine whether statements made to the School

District of Philadelphia on March 2, 2012, April 25, 2012, and May 23, 2012 were voluntary,

under the Due Process Clause of the Fifth and Fourteenth Amendments. Fattah submits that

they were involuntary based on the totality of the circumstances, and were taken in violation

of his Miranda rights. Fattah also submits that the statements were taken in violation of

Fattah's Due Process rights under Kordel, 397 U.S. 11. In the alternative, if the statements

are determined to have been voluntary, Fattah asks the Court to determine whether the

United States improperly departed from the proper administration of justice by merging

purported parallel investigations. Statements are voluntary if, under the totality of the

circumstances, they are "the product of an essentially free and unconstrained choice by

[their] maker." Schneckloth v. Bustamante, 412 U.S. 218, 225 (1973). "If an individual's will

is overborne or that person's capacity for self-determination is critically impaired, her or his

statements are involuntary." United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005).

Relevant factors include the suspect's background and experience, prior dealings with the

criminal justice system and whether there was coercive police activity. Id. "[A] promise -

express or implied - is a factor (indeed, a potentially significant one), in the totality of the

circumstances inquiry as to whether a statement was voluntary." Id. at 109. In United States v. Conley, 859 F. Supp 830, 837 (W.D. Pa. 1994), the district court held a defendant's statements were involuntary where the agent promised to speak to the defendant off the record and approached the defendant in a friendly manner. Fattah submits that the School District of Philadelphia made both express and implied promises in their communications with Fattah and the statements should be excluded. Fattah has no "prior dealings" with the criminal justice system and there was coercive activity in this case.

Fattah was asked by John Brennan, a school district inspector general office employee to visit the School District as part of an inspector general civil investigation into alleged misuse of funds related to School District contracts. Fattah was sent an email by Mr. Brennan, on March 2, 2012 at 9:57a.m. that stated "Chip: can you give me a call. I would like to sit down with you and go over some of the items I have received regarding the various contract requirements and expenses." On April 23, 2012, Fattah received another email from Mr. Brennan saying, in part, "I would like to sit down with you once again to further discuss the various payment rates…of the schools . . . I am out of the office on Tuesday the 24th, but I am open for Wednesday the 25th any time. We can[sic] meet in my office any time on Wednesday." At the meeting on March 2, 2012, Fattah was introduced to Tracy Williams, an employee of the office of inspector general, John Brennan, an employee of the office of inspector general, and John Hess, who Fattah was also told was an employee of the inspector general at the School District of Philadelphia. Mr. Hess is actually an FBI special agent. Fattah was never told this fact on March 2nd or any date that year. Fattah submits that this was fraud, trickery, or deceit used to ensure Fattah made statements he otherwise would not

have made. At these meetings, Fattah was not informed of his rights and was not told he was under criminal investigation related to the School District in any way. At the conclusion of the meeting on March 2, 2012, Fattah was told by Tracy Williams that "Oh yeah, this is all confidential" and by John Brennan "This is all confidential." Prior to the meeting on March 2, 2012, during a phone call, Mr. Brennan told Fattah that all their conversations were confidential and would be used to determine whether or not Fattah could receive payment for helping the District recover money. Fattah was also asked by Ms. Williams to not share the fact the meeting happened with anyone (Ms. Williams: "And you keep it confidential that you came here"). Fattah was told the School District was exploring ways to pay a reward or finders fee related to information Fattah could provide regarding the misuse of District funds. Mr. Brennan, in an email to Fattah said "can you supply me with any documentation regarding the misuse of the funds received from the School District. I am in need of some additional information so I will know how to address your request (reward or finders fee). If you cannot email me then give me a call. Thanks."

On April 23, 2012, Mr. Brennan sent Fattah an email saying "at our last meeting we discussed the need for the copies of the [accounting documents] without redactions. Can you provide these to me at any time soon. I am attempting to move forward in this investigation and I will need these and other information you can provide as the need arises. Thanks in advance." Shortly thereafter, the documents Mr. Brennan requested were provided by Fattah. Mr. Brennan sent Fattah another email on May 7, 2012 stating, in part, "[a]lso if you have any other information regarding the use of the DVHS funds by [another individual] for his personal use I would like those documents if possible. Also any email's that he may have

sent you regarding the misuse of the funding. Thanks." Shortly thereafter, the documents Mr. Brennan requested were provided by Fattah. In Jacobs, the Third Circuit said "…this does not necessarily mean that Jacobs knew she was the target of a criminal investigation and subject to possible prosecution at the time of the April statements. That Jacobs continued to act as an informant rather that a suspect throughout that meeting and during the next day (when she retrieved the suitcases from her home and led Agent Duffey to the safe house) suggests that she did not know she was the target of a criminal investigation and subject to possible prosecution at the time of her April statements . . . there is no evidence that Jacobs wanted to [make statements about her involvement in] a serious crime to an FBI agent who would try to use that [statement] to put her in prison. Had Jacobs known Sullivan was an adversary who would use her statements to convict her — rather than believed he was an ally who would not use her statements against her — it is hard to believe she would have made the statements she did." Jacobs at 111-12. The Third Circuit also noted that the statements were involuntary, in part, because "the questioning took place at the FBI's offices" and Jacobs "did not agree to meet with Sullivan with knowledge of the fact that questioning about a criminal offense would take place". Jacobs at 113 (See United States v. Kim, 292 F. 3d 969, 974 (9th Cir. 2002) ("In determining whether suspects were ;'in custody' for Miranda purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law officers *understanding that questioning would ensue*." (emphasis in original). Again, Fattah was not told Agent Hess was a law enforcement officer with the FBI. In fact, he was told that Mr. Hess was a school district employee. School District employees are not law enforcement officers. In Jacobs, the Third Circuit noted that the District Court

also considered other factors, such as "[Jacobs] was not specifically told she was not under arrest before questioning began" (citing <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (a factor indicating the defendant was not in custody was that he was specifically told he was not under arrest); <u>California v. Beheler</u>, 463 U.S. 1121, 1122 (1983) (same)). The Third Circuit also said "However, the test for custody is not whether the police in fact let a suspect leave at the end of the questioning without hindrance. Rather, it is whether, under the circumstances, a reasonable person would have believed that during the questioning he or she could leave without hindrance. Thus, if this factor is useful at all, it is only an indicator of what the circumstances during the questioning would have made a reasonable person believe. Furthermore, just because an officer lets a suspect leave after he or she has gotten all the desired incriminating evidence does not mean the officer would have let the suspect leave (or, to be more precise, it does not mean the officer made the suspect believe she or he could leave) during the questioning" (p.14). In <u>Brady v. United States</u>, 397 U.S. 742, 743 (1970), the Supreme Court said incriminating statements must not be "obtained by any direct or implied promise, however slight" (internal quotation marks omitted). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." <u>Jacobs</u> at p.19 (citing <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972)).

Fattah requests an evidentiary hearing to determine if the statements were voluntary. Fattah would also request that Mr. Brennan, Ms. Williams and Agent Hess are subpoenaed to appear at such a hearing.

Fattah also submits that under <u>United States v. Kordel</u>, 397 U.S. 11, 12, the Court can find the recordings and transcripts made pursuant to the meetings on March 2, 2012, April

25, 2012, and May 23, 2012 are, in fact, a due process violation. This is a situation under

Kordel, where the government "failed to advise the defendant in its civil proceeding that it

contemplates his criminal prosecution"; "a case where the defendant [wa]s without counsel",

and where the defendant could "reasonably fear prejudice [in 2012] from pretrial publicity or

other unfair injury." Fattah did not have an attorney with him at the School District meetings,

and was not advised that any statement he made could be used against him. As the

government is aware, the School District of Philadelphia Inspector General investigation is a

civil matter. Even if it was not, the District's purported investigation was influenced by the

Department of Justice investigation. Fattah also contends that the School District never, in

fact, considered paying a reward or finders fee, and only misled Fattah that it was

considering doing so.

      The Attorney General's Guidelines for Domestic FBI Operations, dated September

29, 2008, state under a heading "Contacts with Represented Persons" the following: "Contact

with represented persons may implicate legal restrictions and affect the admissibility of

resulting evidence. Hence, if an individual is known to be represented by counsel in a

particular matter, the FBI will follow applicable law and Department procedure concerning

contact with represented individuals in the absence of prior notice to counsel. The Special

Agent in Charge and the United States Attorney or their designees shall consult periodically

on applicable law and Department procedure. Where issues arise concerning the consistency

of contacts with represented persons with applicable attorney conduct rules, the United States

Attorney's Office should consult with the Professional Responsibility Advisory Office." The

United States Attorney's Office and the FBI were aware Fattah was represented by counsel as

of February 29, 2012. Instead of contacting Fattah's counsel, they made direct contact with

an FBI agent, who falsely told Fattah he was a School District employee. In Scrushy, the

Court noted in a footnote that the "Government submitted for in camera review the email

exchange between Department of Justice counsel and its Professional Advisory Office.

Although such officer authorized the contacts at issue, the court expressly makes no

determination of their propriety". Hence, even if the United States Attorney's Office took

steps to ensure the SBA and School District of Philadelphia contacts were reviewed by the

Professional Responsibility Office, that should not change the analysis.

Finally, if the statements are determined by the Court to have been voluntary and not

a due process or miranda violation, they should be suppressed because the School District of

Philadelphia civil investigation and FBI criminal investigation were "inescapably

intertwined" as the district court held in <u>Scrushy</u>, 366 F.Supp.2d 1134 (N.D. Ala. 2005). The

<u>Scrushy</u> court held that "[d]espite the government's assertion that the S.E.C. civil

investigation was separate from and parallel to the Justice Department's criminal

investigation, the facts belie that assertion. To be parallel, by definition, the separate

investigations should be like the side-by-side train tracks that never intersect. By contrast, as

of March 12, 2003 at 3:30 p.m., the S.E.C. civil investigation merged with the Justice

Department criminal investigation." The Court noted that actions such as "extending the

length of the deposition, and asking additional questions that otherwise would not have been

asked after learning of the criminal investigation are properly imputed to the Government for

purposes of this motion." <u>Scrushy</u>, 366 F.Supp.2d 1139. Agent Hess asked hundreds of

questions which undoubtedly extended the length of the statements made to the School

District on March 2, 2012, April 25, 2012, and May 23, 2012. Agent Hess also asked questions which the School District employees would not have asked because of his knowledge of the criminal investigation. Mr. Brennan and Ms. Williams also asked questions that were influenced by Agent Hess's questions made with knowledge of the criminal investigation. The United States did not have only notice and input regarding the meetings at the School District held with Fattah, they placed an agent in the room. The agent represented falsely that he was a School District employee and then asked questions. Fattah submits that allowing use of the tape recordings or transcripts would depart from the proper administration of criminal justice. The FBI and United States Attorney's Office were aware that, as of February 29, 2012, Fattah had counsel representing him in the present investigation. With this knowledge, the government decided that without Fattah believing that the FBI Agent was a School District employee, he would not likely talk to the Agent without his attorneys. Instead of contacting Fattah's then-attorney to negotiate for a potential interview, the government proceeded to engage in fraud, trickery, and deceit to obtain statements to be used in the present proceeding against Fattah. The issues in the purported School District Investigation and Department of Justice investigation as to counts 19-23 overlap completely and the issues in both are identical. Fattah submits that the statements in 2012 taken at the School District of Philadelphia were a violation of Fattah's rights under the Due Process Clause of the Fifth and Fourteenth Amendments. In the alternative, the statements were taken in violation of Fattah's Miranda rights, or improperly as a departure from the proper administration of justice.

**I.   The United States Improperly Reviewed Email Communications Between**

    **Fattah and Former Defense Lawyers**

On February 1, 2013, Fattah received a notification from Google that "Google has received legal process for information related to your account in a matter issued by the FBI." Further, the email said "For more information about the legal process seeking your Google account information, you may wish to contact the party seeking this information at [FBI Philadelphia Phone Number]. Unfortunately, Google is not in a position to…discuss the substance of the process in our possession." At the time, Fattah had exchange hundreds of emails with his legal counsel regarding this investigation which were turned over to the government by Google. Fattah submits that this action was improper because it deliberately interfered with the attorney-client privilege. The government had an objective awareness of an ongoing, personal attorney-client relationship between Fattah and attorneys at Drinker Biddle, and deliberately intruded into that relationship.

Fattah submits that this is just another issue that shows the governments conduct in this matter.

**J.   The United States Has Violated Fed.R.Crim.P. 6(e) on Grand Jury Secrecy and**

    **Damaged Fattah's Reputation in 2012. Further, the United States Improperly**

    **Contacted An Attorney To Interfere With Fattah's Right to a Trial by Jury.**

The United States leaked information to the media on or before February 29, 2012 about this investigation in violation of Rule 6(e) and the Due Process Clause of the Fifth Amendment. The grand jury investigation was not known by anyone other than government officials in the United States Attorney's Office, FBI, and IRS prior to February 29, 2012.

Fattah filed a lawsuit against the Government earlier this year regarding the release of protected tax return information as part of the media leak in 2012. See Fattah v. United States, 2014 U.S. Dist. LEXIS 120021 (E.D. Pa. Aug. 27, 2014). That matter is on hold now, but will proceed to trial by order of the Court at some point in the future. That matter was also improperly discussed before the grand jury. The United States Attorney's Office also improperly contacted Attorney Luther Weaver, III, giving him 6(e) material about Fattah and the grand jury in the year 2014. Two photographers did not coincidentally appears prior to 7:00a.m. at Fattah's home and office on February 29, 2012, they had help from the United States. Finally, the governments violation of Fattah's Due Process rights on February 29, 2012, led to him losing hundreds of thousands of dollars of income, income which would have been available to fund his defense. This pre-indictment conduct, which effects carried over into post-indictment is a violation of the Sixth Amendment right to counsel of choice and to mount the best defense using your own resources.

On February 29, 2012 The Philadelphia Inquirer's website, philly.com, ran a story titled "FBI seizes records of Rep. Fattah's son" (http://articles.philly.com/2012-02-29/news/ 31111091_1_agents-fbi-investigation last accessed December 7, 2014). The story says, in part, "Federal authorities are investigating why a company owned by the son of U.S. Rep. Chaka Fattah was paid $450,000 by an education firm that has received millions in contracts from the Philadelphia School District, according to sources familiar with the probe. Agents from the FBI and U.S. Treasury Department served two search warrants early Wednesday for Chaka Fattah Jr.'s records, the first at his apartment at the Residences at the Ritz-Carlton. They also seized Fattah's records and a computer from the Logan Square law office of David

T. Shulick." Further, the story stated that "Federal agents arrived about 6:40 a.m. Wednesday outside Fattah's home, and at Shulick's office shortly after 10 a.m. They left the law office about 50 minutes later, carrying a Dell desktop computer and boxes of records." Another media outlet, washingtontimes.com, ran a story the same day titled "Lawmaker's son target of federal search" (http://www.washingtontimes.com/news/2012/feb/29/lawmakers-son-target-of-federal-search/ last accessed December 7, 2014). In that story, it says that "IRS Spokeswoman Shauna Frye said only that IRS criminal investigators were at the Residences at the Ritz-Carlton on Wednesday on official business." That communication by the IRS spokesperson allowed anyone with access to Google to determine Fattah's home address. There were many additional news stories in 2012 and 2013. For instance, a newsworks.org story, titled "The final blow? District severs ties with disciplinary school in East Falls", says that "Shulick and DVHS are also involved in an ongoing federal investigation that also reportedly targets Chaka 'Chip' Fattah, Jr., the son of Philadelphia U.S. Rep. Chaka Fattah. The younger Fattah has done consulting work for DVHS. A federal grand jury has subpoenaed DVHS' records and investigators are reportedly looking into…" (http://www.newsworks.org/index.php/local/roxborough-weekly-newsletter/43278-dvhs-update last accessed December 7, 2014). Another story on philly.com, on July 24, 2012 says "a for-profit education firm whose records were recently subpoenaed by a federal grand jury…" (http://articles.philly.com/2012-07-24/news/32805662_1_chaka-chip-fattah-disciplinary-school-alternative-schools last accessed December 7, 2014). Another story, "Feds pay visits to Fattah's son, lawyer" said "Investigators with subpoenas paid a surprise visit to Fattah Jr.'s home at the Ritz-Carlton early yesterday, then swung by Shulick's law firm, leaving with

Fattah's computer and boxes of documents" and "investigators appeared to be focusing on money paid to Fattah Jr…"(http://articles.philly.com/2012-03-01/news/31114158_1_firm-inquirer-investigators last accessed December 7, 2014). Other philly.com stories said "Fattah's son, who has been under federal investigation for months", and "[Fattah] whose political-consulting business is already under FBI investigation". A Philadelphia Magazine story said "Fattah's 30-year-old son Chip has been under investigation by the F.B.I. since 2012, apparently for financial improprieties" (http://www.phillymag.com/news/2013/05/13/ed-rendell-wilson-goode-paying-chaka-fattah-jr-s-legal-bills/ last accessed December 7, 2014). Finally, a story entitled "Behind the facade, troubles rose for Fattah son" said "And the FBI was secretly digging into his finances - even recording his conversations as he talked about his work as a budding political consultant". Fattah submits that a show cause hearing is appropriate and this motion for an order to show cause establishes a prima facie violation of Rule 6(e). See Barry v. United States, 865 F.2d 1317, 1321 (D.C. Cir. 1989). To establish a prima facie case, movants must show that "media reports disclosed information about 'matters occurring before the grand jury and indicated that the sources of the information included attorneys and agents of the Government. Id. (citations omitted). Once a prima facie case is established, movants must first demonstrate that the media reports disclosed "matters occurring before the grand jury". The D.C. Circuit said "matters occurring before the grand jury" include "not only what has occurred before the grand jury, but also what is likely to occur." In re Motions of Dow Jones & Co., Nos. 98-3033 and 98-3034, 1998 WL 216042, *3 (D.C. Cir. May 5, 1998). The past, current, or future matter before the grand jury include "the identities of witnesses…the substance of testimony", "the strategy or direction of the

investigation, the deliberations or questions of jurors, and the like." Id. (citations omitted). The D.C. Circuit has also held that "naming or identifying grand jury witnesses, quoting or summarizing grand jury testimony; evaluating testimony; discussing the scope, focus or direction of the grand jury investigations; and identifying documents considered by the grand jury and conclusions reached as a result of the grand jury investigations" are also matter protected by Rule 6(e)(2) Fund for Constitutional Gov't v. Nat'l Archives & Records Serv., 656 F.2d 856, 869 (D.C. Cir. 1981). In addition to establishing that media reports disclosed "matters occurring before the grand jury," movants must also show that such reports occurred due to the Government's involvement. "It is not necessary for [an] article to expressly implicate the Justice Department [or other governmental entity] as the source of the disclosures if the nature of the information disclosed furnishes the connection." Barry, 865 F. 2d at 1325. The government clearly being the source in one story, may be used to show they were the source in other stories. "The precise attribution of a source in one . . . may give definition of a vague source reference in others because of their context in time or content" Barry at 1326. "Attorneys and agents of the Government" need not be the only source of the disclosure of Rule 6(e) material, but need only be "included" among the sources. Barry at 1321. "Any knowing violation of Rule 6(e) may be punished by contempt of court. Rule 6(e) provides, in pertinent part, that: [A]n attorney for the government … shall not disclose matters occurring before the grand jury, except as otherwise provided in these rules. No obligation of secrecy may be imposed on any person except in accordance with these rules… As with any rule, there are certain narrow exceptions to the confidentiality requirement of Rule 6(e). Under Rule 6(e)(3)(A), grand jury secrets may be disclosed without a court order

to an attorney for the government or to certain governmental personnel for purposes limited to federal criminal law enforcement. When such a disclosure is made, however, an: attorney for the government shall promptly provide the district court, before which was impaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure was made, and shall certify that the attorney has advised such persons of their obligation of secrecy under this rule." United States v. Smith, 992 F.Supp. 743 (D.C. N.J. 1998). When presented with a prima facie case that Rule 6(e) has been violated, the court "must take appropriate steps to determine whether a violation has occurred." Finn v. Schiller, 72 F.3d 1182, 1189 n. 7 (4th Cir.1996). A matter occurring before the grand jury includes the "essence of what takes place in the jury room, in order to preserve the freedom and integrity of the deliberative process." United States v. Smith, 787 F.2d 111, 115 (3d Cir. 1986) (quoting Grand Jury Investigation, 630 F.2d at 1000). In United States v. Smith, 992 F.Supp. 743 (D.C. N.J. 1998), the Court said "there is no evidence that [non-federal government employees] are involved in federal criminal law enforcement, and, even if they were, the United States Attorney's Office failed to provide this Court with the names of the [individuals] to whom the information was divulged." The Court noted that companies and individuals who had not been indicted at the time were left, due to the disclosures, "just as defenseless as the medieval prisoner and the victim of the lynch mob" (quoting United States v. Briggs, 514 F.2d 794, 803 (5th Cir. 1975)). The Court further said that "If the United States Attorney's Office had even a moment's hesitation about whether the [disclosure] contained Rule 6(e) material, the proper forum in which to bring that concern was before this Court." In Smith, the Court ordered the United States Attorney's office to issue a letter of apology,

approved by the Court for its wrongful disclosure of the 6(e) material, with such letter to be posted on the website maintained by the United States Attorney's Office. The Court ruled that the letter shall inform the recipient that the information provided to the recipient was confidential and should not have been so revealed. Fattah submits that in addition to contempt, the same letter of apology is appropriate here. Further, any other remedy the Court believes is appropriate. Fattah asks that the 6(e) violations described herein be considered in aggregate with the rest of the motion as to the government's conduct. However, the media leak in 2012 was not the only release of Rule 6(e) material in this matter.

Assistant United States Attorney Paul Gray contacted Mr. Weaver, an attorney for Fattah's father, in early 2014 by phone. Mr. Weaver has never represented Fattah [Jr.] in any legal matter. AUSA Gray informed Mr. Weaver that the allegations and other evidence in this present Indictment and upcoming trial will "embarrass" Fattah's father. AUSA Gray also spoke of specific charges, such as "bank fraud" and concerns about the statute of limitations on some charges. The substance of the conversation included AUSA Gray indicating his belief of Fattah [Jr.'s] guilt as to the present charges. AUSA Gray was well aware that any communications from their office would be communicated to Fattah's father, as part of Mr. Weaver's ethical obligations and his father's attorney-client relationship. Fattah submits that this was a blatant attempt at interfering with Fattah's constitutional right to a jury trial, and the right to hold the government to its burden of proof beyond a reasonable doubt. Fattah requests that the Court order AUSA Gray to submit a letter, in the public docket, detailing his conversation with Mr. Weaver as it relates to Fattah [Jr.] and the charges in the present Indictment. This conversation was months before the Indictment was returned in August

2014. AUSA Gray confirmed to Fattah's previous counsel, Nina Spizer and James McHugh, that this call took place, and described it as some sort of courtesy. Fattah believes this is inappropriate conduct by the United States Attorney's Office. Fattah submits this also serves as a Rule 6(e) violation as specific charges the grand jury was considering were disclosed by AUSA Gray, and Mr. Weaver is not a federal law enforcement official. AUSA Gray made certain statements that could reasonably lead this Court or any reasonable individual person to question the independence of the grand jury. Fattah submits that if AUSA Gray did not inform the Court prior to disclosing this information to Mr. Weaver, that alone serves as a violation of grand jury secrecy under Rule 6(e). As the Third Circuit has said, a matter occurring before the grand jury includes the "essence of what takes place in the jury room, in order to preserve the freedom and integrity of the deliberative process." United States v. Smith, 787 F.2d 111, 115 (3d Cir. 1986) (quoting Grand Jury Investigation, 630 F.2d at 1000). There can be no serious dispute that AUSA Gray disclosed the "essence" of what was "tak[ing] place in the grand jury room" in that phone call. Id. The phone call to Mr. Weaver by AUSA Gray could also be correctly described as summarizing grand jury testimony and speaking about matters that occurred before the grand jury.

The Seventh Circuit has said "One of the principle reasons for preserving the secrecy of grand jury proceedings is to protect the reputations of both witnesses and *those under investigation*" (emphasis added). Lucas v. Turner, 725 F.2d 1095, 1100 (7th Cir. 1984). The Fifth Circuit held that "the secrecy provisions of Rule 6(e) apply not only to disclosures of events which have already occurred before the grand jury, such as a witness's testimony, but also to disclosures of matters which will occur, such as statements which reveal the identity

of persons who will be called to testify" In re Grand Jury Investigation, 610 F.2d 202, 216-17 (5th Cir. 1980).

Finally, Fattah submits that the media leak by government officials on or prior to February 29, 2012 deprived him of his liberty in violation of his right to procedural and substantive Due Process under the Fifth Amendment. Reputational harm, combined with more tangible interests such as employment, and operating a business, are implicated in this matter. Fattah contends his due process rights were violated under the Supreme Court's stigma-plus doctrine. Plainly, the government could have charged Fattah on February 29, 2012 or simply Indicted Fattah, as they have presently, on August 5, 2014 without leaking any information to the media and causing Fattah to lose hundreds of thousands of dollars between those dates. Fattah contends that disclosure of the grand jury investigation by the United States is directly responsible for the overwhelmingly negative media attention about this investigation and Fattah in 2012 and 2013, beginning approximately 2.5 years prior to the return of the present Indictment. The existence of a grand jury investigation, the fact that it was targeting Fattah, and the existence of subpoenas and what records the subpoenas requested, the existence of search warrants and details therein, the strategy or direction of the investigation, summarizing grand jury testimony, as well as target identification data and witness identification data are implicated in this matter. Further, "the essence of what takes place in the jury room" was disclosed under United States v. Smith, 787 F.2d 111, 115 (3d Cir. 1986) (quoting Grand Jury Investigation, 630 F.2d at 1000). Fattah submits that the United States violated his Due Process rights on February 29, 2012, which caused him to lose substantial income over the past 2.5 years. That income could have been used to retain

experienced counsel in this matter. Fattah submits that the Due Process violation on February

29, 2012, also caused a Sixth Amendment violation which was triggered on the date of the

Indictment being unsealed on August 5, 2014. See United States v. Stein, No. 07-3042-cr

(2nd Cir. August 28, 2008).

    In Stein, the Second Circuit upheld the dismissal of an Indictment based on findings

of fact that the United States had deprived the defendants of their right to substantive due

process under the Fifth Amendment and violations of their Sixth Amendment rights. The

Court held that "the government thus unjustifiably interfered with defendants' relationship

with counsel and their ability to mount a defense, in violation of the Sixth Amendment, and

that the government did not cure the violation. Because no other remedy will return

defendants to the status quo ante, we affirm the dismissal of the indictment." (Id. at p.6). The

decision in Stein dealt with the governments intentional interference with the defendants

ability to pay counsel with funds provided by their employers, and consequently the limits

placed on the defendants choice of counsel and strategic choices regarding trial preparation.

The Second Circuit further said the district court "ruled that a defendant has a fundamental

right under the Fifth Amendment to fairness in the criminal process, including the ability to

get and deploy in defense all 'resources lawfully available to him or her, free of knowing or

reckless government interference, and that the government's reasons for infringing that right

in this case could not withstand strict scrutiny'. Judge Kaplan also ruled that the same

conduct deprived each defendant of the Sixth Amendment right "to choose the lawyer or

lawyers he or she desires and to use one's own funds to mount the defense that one wishes to

present. [The District Judge] reasoned that 'the government's law enforcement interests in

taking the specific action in question [do not] sufficiently outweigh the interest of the []

Defendants in having the resources needed to defend they think proper against these

charges." (Id. at p.20-21.) The Court noted the District Judge "further determined that

defendants need not show how their defense was impaired: the government's interference

with their Sixth Amendment 'right to be represented as they choose,' 'like a deprivation of

the right to counsel of their choice, is complete irrespective of the quality of the

representation they receive." Id. at 22. Further, the Court said "The appropriate remedy for a

constitutional violation is 'one that as much as possible restores the defendant to the

circumstances that would have existed had there been no constitutional error.' " (quoting

United States v. Carmichael, 216 F.3d 224, 227. (2nd Cir. 2000)). Id. at p.35.

The Second Circuit in Stein said "The district court's ruling on the Sith Amendment

was based on the following analysis (set out here in précis). Th Sixth Amendment protects

"an individual's right to choose the lawyer or lawyers he or she desires," Stein I, 435 F. Supp

2d at 366 (citing Wheat v. United States, 486 U.S. 153, 164 (1988)), and "to use one's own

funds to mount the defense that one wishes to present,"id. (citing Caplin & Drysdale,

Chartered v. United States, 491 U.S. 617, 624 (1989)). The goal is to secure "a defendant's

right to spend his own money on a defense. Id. at 367." (p.50). Further, "Defendants need not

make a 'particularized showing' of how their defense was impaired, id. at 372, because

'[v]irtually everything the defendants do in this case may be influenced by the extent of the

resources available to them,' such as the selection of counsel and 'what the [] Defendants can

pay their lawyers to do,' id. at 371-72. Therefore, the Sixth Amendment violation 'is

complete irrespective of the quality of the representation they receive.' Id. at 369" (Stein p.

50-51). Further, "[M]ost of the state action relevant here…pre-dated the indictments of August and October 2005. . . So we must determine how this pre-indictment conduct may bear on defendant's Sixth Amendment claim. 'The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: it does not attach until a prosecution is commenced.' Rothgery v. Gillespie County, 554 U.S. —-, 128 S.Ct. 2578, 2583 (2008) (quoting U.S. Const. amend. VI) (some internal quotation marks and footnote omitted). 'Attachment' refers to 'when the [Sixth Amendment] right may be asserted'; it does not concern the separate question of 'what the right guarantees' i.e., what the 'substantive guarantee of the Sixth Amendment' is at that stage of the prosecution. Id. at 2592, 2592 (Alito, J., concurring) . . . state action that also (or only) affected the advancement of legal fees for service rendered post-indictment does implicate defendants' Sixth Amendment rights, regardless of when the conduct took place. . .In other words, the government's pre-indictment conduct was of a kind that would have post-indictment effects of Sixth Amendment significance, and did. We endorse this analysis. Although defendants' Sixth Amendment rights attached only upon indictment, the district court properly consider pre-indictment state action that affected defendants post-indictment. When the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivation upon indictment." (Stein p.52-55) Further, the Court said "We now consider 'what the [Sixth Amendment] right guarantees." Rothgery, 128 S.Ct. at 2592 (Alito, J., concurring.). The Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Thus

"the Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." Caplin & Drysdale, Charter v. United States, 491 U.S. 617, 624-45 (1989). "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). The government must "honor" a defendant's Sixth Amendment right to counsel . . .Their claim is that the government unjustifiably interfered with their relationship with counsel and their ability to mount the best defense they could muster." "In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using what assets one has or might reasonably and lawfully obtain." (Stein, p.62). "The government conceded at oral argument that it is in the government's interest that every defendant receive the best possible representation he or she can obtain. . .But if it is in the government's interest that every defendant receive the best possible representation, it cannot also be in the government's interest to leave defendants naked to their enemies. (Stein p.65)." As the Supreme Court said in Gonzalez-Lopez, 548 U.S. at 144, 148-52. "[T]he right at stake here is the right to counsel of choice, . . . and that right was violated because the deprivation of counsel was erroneous. No addition showing of prejudice is required to make the violation 'complete'" Id. at 146. In Stein, four of the defendants were deprived on their Sixth Amendment right to counsel of choice. The other nine defendants asserted that the government unjustifiably interfered with their relationship with counsel and their ability to defend themselves. In Stein, the Court said "We agree: these defendants can easily demonstrate interference in their relationships with counsel and

impairment of their ability to mount a defense…these defendants 'have been forced to limit their defenses . . . for economic reasons . . . We therefore hold that these defendants were also deprived of their right to counsel under the Sixth Amendment. (Stein p.67)".

In the Stein case, the Sixth Amendment violation dealt with money from the defendants employers. In the present case, Fattah had a profitable business with greater than $170,000 in profits in 2011 and $160,00 in 2010. The United States interfered with Fattah's business activities and employment opportunities, and caused harm to his reputation starting on February 29, 2012. The information given to the media was only in the possession of the United States at the relevant times and dates. Fattah notes that in Stein, the Court held that even money the defendants had not received could implicate a Sixth Amendment violation. Fattah submits that this conduct caused him to be without funds he would have earned which undoubtedly affect his choice of counsel and ability to mount a defense. Fattah contends the Court should consider this issue, alongside the other misconduct by the government herein.

## K.  False Statements and Material Omissions in the February 2012 Search Warrant Affidavit. Further, the Search Warrant Was A "General Warrant"

The authority in Franks v. Delaware, 438 U.S. 154 (1978), requires suppression of evidence secured pursuant to a search warrant issued on the basis of false statements or omissions made knowingly and intentionally, or with reckless disregard for the truth. Id. at 155-56; United States v. Brown, 631 F.3d 638, 642 (3d Cir. 2011) (citing Franks, 438 U.S. at 155-56). The Franks rule applies not only to false statements, but also to omitted material statements. Sherwood v. Mulvihill, 113 F.3d 396, 400 (3d Cir. 1997) (citations omitted). The police cannot present only inculpatory evidence to the magistrate. Wilson v. Russo, 212 F.3d

781, 787 (3d Cir. 2000). The applicant for a warrant must include all material information

that has a bearing on the probable cause determination and can affect that determination. See

Franks, 438 U.S. at 165, 171. "An assertion is made with reckless disregard when 'viewing

all the evidence, the affiant must have entertained serious doubts as to the truth of his

statements or had obvious reasons to doubt the accuracy of the information he reported."

Wilson, 212 F.3d at 788. Conduct is reckless when either the affiant "actually entertained

doubts" or there were "obvious reasons" for him to doubt, permitting the fact finder to infer a

"subjectively reckless state of mind." Brown, 631 F.3d at 645. The analysis comes down to

whether the affiant had justification for making the statement, either from first-hand

observation, third-party source, or "some textual source." Id. at 648. The affiant may not

speculate or supply facts that he believes exist. Id. at 648-49. He must have a sufficient basis

grounded in fact to make the assertion. Id. at 649. In sum, one may infer that the affiant

"acted with reckless disregard for the truth where his affidavit contain an averment that was

without sufficient basis at the time he drafted it." Id. Stated differently, "the total lack of an

evidentiary basis for making an averment can constitute an obvious reason for doubting that

averment's veracity . . . ." Id. at 650.

　　FBI Agent Haag made a number of false statements in the search warrant affidavit,

some of which were discussed above regarding Mr. Amato. In addition to those false and

misleading statements, FBI Agent Haag falsely told the Magistrate Judge the following: (1)

that Fattah "executed his criminal schemes" from his then-apartment and then-office ("These

are the places from which Fattah executed his criminal schemes" Affidavit p.3); (2) that

Agent Haag, after reviewing Fattah's banking records ("my review of Fattah's banking

records" Affidavit p.16), did not find any "records which indicate a business purpose other than establishing business lines of credit" for Chaka Fattah Jr. & Associates (Affidavit p.4); (3) that Fattah's American Express account "was used almost exclusively for personal expenses (Affidavit p.5)"; (4) that the money deposited "into Fattah's TD Bank account was used for personal purchases (Affidavit p.7)"; (5) that Fattah was "still using the 259 Strategies name during 2010" (Affidavit p.14); and (6) that Fattah's expenditures were "inconsistent with the operation of any business, including a high-end concierge service or a marketing or management company (Affidavit p.9)". FBI Agent Haag also omitted material information from the search warrant affidavit. First, regarding the Sun National Bank credit line, Agent Haag said Fattah made an electronic payment to his personal Bank of America credit account in the amount of $13,000 (Affidavit p.7). Agent Haag did not inform the Magistrate Judge of the amounts transferred from that card to Fattah's business account in 2005, prior to receiving that line of credit. Second, Agent Haag told the Magistrate Judge that Sun National "bank rejected the offer", referring to a $3,500 settlement offer. Agent Haag did not inform the Magistrate Judge that Sun National Bank later received $15,000 without any financial representations by Fattah in early 2010. The public records for this loan showed at the time the lawsuit had been vacated by request of the bank. (Affidavit, paragraph 20, p.13). Third, Agent Haag also omitted that Fattah told the Agent that 259 Strategies LLC was operating but that his sole proprietorship was not using the name 259 Strategies in 2010.

Fattah also contends that the scope and execution of the search warrant was in violation of the Fourth Amendment because it was a general warrant. The warrant in this case was a "general warrant" and plainly lacked the requisite particularity concerning the items to

be seized so that official reliance on it was not reasonable. The Fourth Amendment provides

that "No Warrant shall issue, but upon probable cause, supported by Oath or affirmation and

particularly describing the place to be search, and the person or things to be seized." The

Third Circuit has said "The Fourth Amendment does not prohibit search for long lists of

documents or other items provided that there is probable cause for each item on the list and

that each item is particularly described." United States v. Ninety-two Thousand Four

Hundred Twenty-Two Dollars and Fifty-seven Cents, 307 F.3d 137, 148 (3d Cir. 2002).

(citing "The particularity requirement 'makes general searches . impossible.' " United

States v. Christine, 687 F.2d 749, 752 (3d Cir.1982) quoting Marron v. United States, 275

U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927); see also, e.g., Stanford v. Texas, 379 U.S.

476, 480, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). A general warrant authorizes "a general,

exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S.

443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In order for a warrant to be invalidated as

general, it must "vest the executing officers with unbridled discretion to conduct an

exploratory rummaging through [defendant's] papers in search of criminal evidence."

Christine, 687 F.2d at 753. As we noted in Christine, examples of general warrants are those

authorizing searches for and seizures of such vague categories of items as " 'smuggled

goods,' " " 'obscene materials,' " " 'books, records, pamphlets, cards, receipts, lists,

memoranda, pictures, recordings and other written instruments concerning the Communist

Party of Texas,' " " 'illegally obtained films,' " and " 'stolen property' ").

     The search warrant in the present matter is such a general warrant (See Search

Warrant Attachment B). At the time of the search warrant, the affidavit shows that the United

States was investigating counts 1-10, 14-16 and 18, which alleged conduct occurred between June and November in 2005, as well as Fattah's income in 2010, and a phone call in May 2011. The search warrant only contains the following statutes: 18 U.S.C. § § 1344 and 1001, and 26 U.S.C. § § § 7201, 7203, and 7206. The United States did not believe Fattah's 2009 income tax return was false at the time of the search warrant in February 2012 ("It does not appear that this return was false" Affidavit p.19, footnote). The United States did not request the search warrant related to counts 19-23 pertaining the the School District of Philadelphia. Nevertheless, the United States seized documents related to DVHS and the School District of Philadelphia, from both Fattah's computer and physical copies taken during the search warrant. The affidavit in this case did not provide probable cause for the seizure of documents related to DVHS and the School District of Philadelphia.

The search warrant attachment covered time periods before and after the alleged conduct in the accompanying affidavit. For instance, the first alleged offense was in late June 2005, but the search warrant covers a period starting in January 2005, nearly six months earlier. Also, the last alleged offense which pertains to any records was in December 2010 based on the search warrant affidavit, however, the search covered documents up to and including February 29, 2012, nearly 14 months later. Therefore, there was no probable cause for approximately 20 months of documents listed on the face of the search warrant. The Third Circuit has said "The Fourth Amendment does not prohibit searches for long lists of documents or other items provided that there is probable cause for each item on the list and that each item is particularly described." Ninety-two Thousand Four Hundred Twenty-Two

Dollars and Fifty-seven Cents, 307 F.3d 137, 148 (3d Cir. 2002). There was not "probable cause for each item on the list" and "each item [was not] particularly described.

Further, the search warrant listed documents to be seized including a large number of people and entities. First, the search warrant attachment lists the names of three elected officials, and Fattah submits that this is evidence of bad faith and motive in searching Fattah's apartment and office. The United States used the search of Fattah's apartment on February 29, 2012 to unconstitutionally search for documents unrelated to the bank, SBA, and tax crimes for which FBI Agent Haag submitted the probable cause affidavit. Fattah contends that the United States's search of Fattah's apartment and office was a "general, exploratory rummaging in a person's belongings". The FBI Agents searched Fattah's house not only for documents described in the search warrant affidavit, but also for evidence of other alleged conduct for which the United States did not have probable cause, for instance anything related to those politicians and his then-girlfriend. Fattah submits this was an unconstitutional fishing expedition by Agent Haag and the United States. Agent Haag primarily focuses on investigations involving politicians. As the affidavit states, Agent Haag is "a Special Agent with the Federal Bureau of Investigation assigned to the Public Corruption Unit . . . [His] responsibilities as a Special Agent include the investigation of violations of federal law, and as an agent [he has] participated in more than ten criminal investigations involving allegations of bribery, extortion, theft of government funds, and related offenses. (Affidavit p.1)." Second, Fattah notes several laptops were seized contains personal photographs, music files, and thousands of files unrelated to this investigation as described in the search warrant affidavit. Third, there are other entities and individuals listed

on the search warrant affidavit, including Fattah's then-girlfriend, and other entities which are not related to the probable cause in the search warrant affidavit. Fattah submits that even the good faith exception does not cover the conduct described herein. For instance, there was no probable cause related to the School District, so any documents related to it should be excluded. The Third Circuit has identified several situations where the good faith exception does not apply, including "when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized, when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit and when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function". <u>Ninety-two Thousand Four Hundred Twenty-Two Dollars and Fifty-seven Cents</u>, 307 F.3d 137, 148 (3d Cir. 2002). Fattah submits that those exceptions are applicable to any items that would be covered by the good faith exception. First, the warrant was issued based on a "deliberately" false affidavit concerning the above statements, the statements in the affidavit related to Mr. Amato as described elsewhere (Section E. p.38-42), and the fact that Agent Haag wanted to seize evidence of alleged crimes related to politicians without probable cause or even a statute in the search warrant covering the conduct. Second, the warrant failed to particularize the things to be seized. Third, the Magistrate Judge respectfully should have performed the "neutral and detached function" and inquired further or removed the names of the three politicians from the search warrant, and attachment b, containing his signature. The Third Circuit has said "[w]hen the Supreme Court announced the good faith exception in Leon, it weakened the exclusionary rule, but it did not eviscerate it. Good faith is not a magic lamp for police officers to rub whenever they find themselves in

trouble." United States v. Zimmerman, 277 F.3d 426, 437-38 (3d Cir. 2002). The United

States has indicated to Fattah's previous counsel that it intends to introduce evidence, at trial,

that was seized pursuant to the search warrant, that has no relation to the probable cause in

the supporting affidavit. In this case, the executing officers had unbridled discretion to

conduct an exploratory rummaging through Fattah's papers in search of criminal evidence.

The Supreme Court has said that the exclusionary rule was developed to "deter unlawful

searches by police". Sheppard, 468 U.S. at 990, 104 S.Ct.3424 (quoting Gates, 462 U.S. at

263, 103 S.Ct. 2317 (White, J., concurring in judgement)). "The general touchstone of

reasonableness which governs Fourth Amendment analysis . governs the method of

execution of the warrant." United States v. Ramirez, 523 U.S. 65, 71, 118 S.Ct. 992, 140

L.Ed.2d 191 (1998). Reasonableness is determined "by assessing, on the one hand, the

degree to which [a search or seizure] intrudes upon an individuals's privacy and, on the other,

the degree to which [a search or seizure[ is needed for the promotion of legitimate

government interests." Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.

2d 408 (1999). The Third Circuit in Ninety-two Thousand Four Hundred Twenty-Two

Dollars and Fifty-seven Cents, 307 F.3d 137, 148 (3d Cir. 2002) said "The privacy of those

whose Fourth Amendment interests are affected by the search should not be infringed to a

greater degree than is reasonably necessary to serve the legitimate interest of law

enforcement. One reasonable way of proceeding is outlined in the Model Code of Pre-

Arraignment Procedure SS § 220.5 (1975), which recommend that where 'documents to be

seized cannot be searched for or identified without examine the contents of other documents,

the executing officer shall not examine the document but shall either impound them under

appropriate protection where found, or seal and remove them for safekeeping pending further proceeding.' Id. at § 220.5(2). Promptly following the removal or impoundment of the documents, an executing office should 'report the fact and circumstances of the impounding or removal to the issuing official. As soon thereafter as the interests of justice permit, and upon due and reasonable notice to all interested persons, a hearing shall be held before the issuing official . at which the person from whose possession or control the documents were taken . may appear . and move (a) for the return of the documents in whole or in part, or (b) for specification of such conditions and limitations on the further search for document to be seized as may be appropriate to prevent unnecessary or unreasonable invasion of privacy.' Id. at § 220.5(3). This adversary hearing enable the moving party to request that certain procedures be used to 'prevent excessive invasions of privacy.' Not to Model Code of Pre-Arraignment Procedure SS § 220.4; see also United States v. Tamura, 694 F.d 591, 595-97 (9th Cir. 1982). These procedure may include conducting the search in the presence of counsel, allowing the moving party to demonstrate that certain files or portions of intermingled documents could not possibly fall within the scope of the search warrant, or requiring that the search be conducted by the special master." Fattah contends that the government could not identify the documents listed in the search warrant "without examining the contents of other documents". Fattah submits that such a hearing never took place and Fattah was never given notice by the United States regarding such a hearing.

In the alternative, Fattah submits that the search warrant was "overly broad" based on the above. An overly broad warrant "describe[s] in both specific and inclusive generic terms what is to be seized." but it authorizes the seizure of items as to which there is no probable

cause. <u>Christine</u>, 687 F.2d at 753-54. Fattah moves for redaction of the warrant on this

ground. "Failure to limit broad descriptive terms by relevant dates, when such dates are

available to the police, will render a warrant overbroad." <u>United States v. Ford</u>, 184 F.3d 566,

576 (6th Cir. 1999). The Supreme Court has said that a "subpoena *duces tecum* is far too

sweeping in its terms to be regarded as reasonable. It does not require production of a single

contract, or of contacts with a particular corporation, or a limited number of document, but

all understandings, contracts, or correspondence between the [company], and no less than six

different companies, as well as all reports made and accounts rendered by such companies

from the date of the organization of the [company] as well as all letters received by that

company since its organization from more than a dozen different companies . . . [because] it

would scarcely be more universal in its operation or more completely put a stop to the

business of that company. Indeed, it is difficult to say how its business could be carried on

after it had been denuded of this mass of material, which is not shown to be necessary in the

prosecution of this case and is clearly in violation of the general principle of law with regard

to the particularity required in the description of documents necessary to a *search warrant* or

subpoena (emphasis added)" <u>Hale v. Henkel</u>, 201 U.S. 76-77 (1906). Further, the Supreme

Court in <u>Hale</u> said "A general subpoena of this description is equally indefensible as a *search*

*warrant would be* if couched in similar terms."(emphasis added) (citing <u>Ex parte Brown</u>, 72

Missouri 83, <u>Shaftsbury v. Arrowsmith</u>, 4 Ves. 66; <u>Lee v. Angas</u>, L.R. 2 Eq. 59.). Applying

these principles, a district court has said "That the subpoena is overbroad and unreasonable

on its face warrants little discussion . . .The Court sees little meaningful distinction between

the scope and practical effect of the instant subpoena and the unlawful subpoena in Hale v.

Henkel". In re: Grand Jury No. 09-01 (Case No. 6:10-mc-38-orl-31DAB - M.D. Fl. June, 10

2010). The search warrant in this case seized 7 years of documents, without any particularity

or separating documents or computer equipment necessary to operate the business.

      For the above reasons, Fattah contends the search warrant is a general warrant. In the

alternative, the warrant is overly broad. Fattah also requests that the Court consider this

conduct by the United States in the aggregate with the other sections of this motion.

## C.   General Principles Governing Prosecutorial Conduct

      As the Ninth Circuit said in Northern Mariana Islands v. Bowie, 243 F.3d 1109

(2001), "Few things are more repugnant to the constitutional expectations of our criminal

justice system that covert perjury, and especially perjury that flows from a concerted effort

by rewarded criminal to frame a defendant. The ultimate mission of the system upon which

we rely to protect the liberty of the accused as well as the welfare of society is to ascertain

the factual truth, and to do so in a manner that comports with due process of law as defined

by our Constitution, This important process of law is utterly derailed by unchecked lying

witnesses, and by any law enforcement officer or prosecutor who finds is tactically

advantageous to turn a blind eye to the manifest potential for malevolent disinformation. See

United States v. Wallach, 935 F.2d 445, 446 (2nd Cir. 1991) ("Indeed, if it established that

the government knowingly permitted the introduction of false testimony 'reversal is virtually

automatic.'") (quoting United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975)) . . .

Because of the gravity of depriving a person of liberty on the basis of false testimony, the

Supreme Court and the United States Courts of Appeals have fashioned over the years a

workable see of precise rules designed not only to remedy egregious wrongs that have

already occurred, but also prophylactically to prevent damaging false testimony from happening in the first place." Further, the Ninth Circuit in <u>Bowie</u> said "It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial." (citing <u>George v. Camacho at 486</u>, 119 F.3d 1393 (9th Cir. 1997). <u>See also</u> <u>United States v. LaPage</u>, 231 F.3d 488, 492 (9th Cir. 2000) ("A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials.") (<u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (an individual prosecutor has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.") (<u>United States v. Gallo</u>, 394 F.Supp. 310, 315 (D.Conn. 1975) (prosecutor failed to indicate to grand jury the quality of hearsay testimony that body was receiving). The Second Circuit has upheld the dismissal of an indictment because of the cumulative impact of grand jury misconduct by the United States. <u>United States v. Hogan</u>, 712 F.2d 757 (2d Cir. 1983).

The Supreme Court said that prosecutors have a "responsibility and duty to correct what he knows to be false and elicit the truth." <u>Napue v. Illinois</u>, 360 U.S. at 269-70, 79 S.Ct. 1173. "The United States Attorney is the representative of not an ordinary party to a controversy, but of a sovereignty who obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from

improper methods calculate to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935). The prosecutor's misconduct in Berger consisted of misstating the facts in his cross-examination of witnesses, putting words into the mouths of witnesses, bullying witnesses "and, in general, of conducting himself in a thoroughly indecorous and improper manner." Id. at 84, 55 S.Ct. at 631.

In United States v. Serubo, 604 F.2d 807, the Third Circuit said the "prosecutor's misconduct was extreme . . . and was inconsistent with the American Bar Association Standards Relating to the Prosecution Function. In particular, [the AUSA] acted inconsistently with Standard 3.5(b), Relations with grand Jury, admonishing that "(the prosecutor) should give due deference to (the grand jury's) status as an independent legal body," and that he "should not make statement or arguments in an effort to influence the grand jury action in a manner which would be inadmissible at trial before a petit jury. . .See also Standard 3.6(a)". In Serubo, the Third Circuit instructed the "trial court, upon completion of [a motion to quash] hearing, to furnish to the Attorney General of the United States copies of the transcript reflecting prosecutorial misconduct so that the Justice Department may consider appropriate discipline." Id. at 69.

**D.  The Indictment Should Be Dismissed With Prejudice**

The Third Circuit has said "[d]eliberate misconduct is targeted for extra deterrence because we expect willful misbehavior to be the most effectively deterred by enhanced penalties." Gov. of the Virgin Islands v. Fahie, 419 F.3d 249 (3d Cir. 2005) (citing Nat. Hockey League v. Met. Hockey Club, Inc., 427 U.S. 639, 643 (1976) ("[T]he most severe in

the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent").

Further, the Third Circuit in <u>Fahie</u> said "[a] pattern of constitutional violations may be used to show recklessness on the part of the prosecutor" (citing Sample v. Diecks, 885 F.2d 1099, 1117 (3d Cir. 1989) ("The existence of a pattern of constitutional violations may provide a basis for implying deliberate indifference.")". <u>See Wehr v. Burroughs Corp.</u>, 619 F. 2d 276, 282 (3d Cir. 1980) ("only three degrees of culpability are associated with the term 'willful': intentional, knowing, or reckless"); <u>cf.</u> <u>United States v. Johnstone</u>, 107 F.3d 200, 208-09 (3d Cir. 1997) (holding that "willful[]" in federal criminal rights statute, 18 U.S.C. § 242 "means either particular purpose or reckless disregard"). The United States has shown a knowing, intentional, flagrant and reckless disregard for Fattah's rights regarding the search warrant affidavit in 2012, grand jury process in 2013-2014 and post-indictment as it pertains to not contacting the Court, the grand jury, or Fattah's previous counsel to inform of the perjury before the grand jury. Further, post-indictment conduct by the United States related to filing Mr. Amato's information and plea memorandum containing false information.

In <u>United States v. Aguilar</u>, et al., (Crim. No. 2:10-cr-01031 Doc. 665 p.40 Central District California), the district Court said "[w]ithin the period beginning in 2008 and continuing at least through June 27, 2011, the Government team committed many wrongful acts. It should not be permitted to escape the consequence of that conduct. By not allowing it to benefit from a "do over", the Court hopes that this ruling will have a valuable prophylactic

effect." Further, the Court distinguished <u>Bank of Nova Scotia</u>, because the indictment was not dismissed solely for misconduct before the grand jury. The Court said "[u]nlike in <u>Bank of Nova Scotia</u>, however, the issue now is not whether the indictment should be dismissed solely because of misconduct in and before the grand jury. Although such misconduct was the critical component that triggered the motion to dismiss that was filed on May 9, 2011, the prosecution of this case was marred by a much wider range of misconduct." <u>Id</u>. p.28. In <u>Aguilar,</u> the government misconduct that led to the dismissal of the indictment included that the "Government team allowed a key FBI agent to testify untruthfully before the grand jury, inserted material falsehoods into affidavits submitted to magistrate judges in support of applications for search warrant and seizure warrants, improperly reviewed email communications between one Defendant and her lawyer……and even made misrepresentations to the Court." <u>Id</u>. p.2. Initially, the Government appealed the dismissal of the Indictment in <u>Aguilar</u> to the Ninth Circuit. Six months later, the government filed a voluntary dismissal of the appeal.

Fattah submits that the conduct described herein can be accurately described as willful, flagrant and attributable to the United States. Deliberate introduction by the United States of false testimony, by Mr. Amato, Mr. Braxton, Mr. McCarthy and FBI Agent Haag violated Fattah's right to an unbiased grand jury acting independently of the prosecuting attorney. Due process requires much more.

"The prosecutor's job isn't just to win, but to win fairly, staying well within the rules." <u>United States v. Kojaya</u>, 8 F.3d 1315, 1323 (9th Cir. 1993). "Our criminal justice system depends on the integrity of the attorneys who present their cases to the jury. When

even a single conviction is obtained through perjurious or deceptive means, the entire foundation of our system is weakened." <u>Hayes v. Brown</u>, 399 F.3d 972 (9th Cir. 2005) (en banc) (citing <u>Bowie</u>, 236 F.3d 1109, at 1096 "The authentic majesty in our Constitution derives in large measure from the rule of law — principle and process instead of person. Conceived in the shadow of an abusive and unanswerable tyrant who rejected all authority save his own, our ancestors wisely births a government not of leaders, but of servants of the law. Nowhere in the Constitution or in the Declaration of Independence, nor for that matter in the Federalist or in any other writing of the Founding Fathers, can one find a single utterance that could justify a decision by any oath-beholden servant of the law to look the other way when confronted by the real possibility of being complicit in the wrongful use of false evidence to secure a conviction in court.") ("It is well settled that the presentation of false evidence violates due process.") <u>Phillips v. Woodward</u>, 267 F.3d 966, 984-85 (9th Cir. 2001) (citing <u>Napue</u>, 360 U.S. at 269, 79 S.Ct. 1173).

## E.  Conclusion

Fattah respectfully asks the Court to review the entire motion, and the false and misleading statements in light of 18 U.S.C. § 1623 and the grand jury's role as an independent body separate from the prosecutor. Fattah also asks that the Court review the false statements in the search warrant affidavit and other documents filed by the United States. Fattah brings this motion in light of the Court's supervisory power and due process grounds to dismiss counts the entire Indictment or counts 1-7, 12 and 19-23. The Supreme Court has said a proceeding "[t]hat casts the prosecutor in the role of an architect," instead of

participant does not "comport with standards of justice" Brady v. Maryland, 373 U.S. 83, 88

(1963).

　　In determining the answer to whether the grand jury was "substantially influenced the

decision to indict or [whether] there is 'grave doubt' that the decision was free from the

substantial influence of" improper evidence test in Bank of Nova Scotia, the Eleventh Circuit

said "our task is to examine the state of mind of the grand jurors. . . our only source of

evidence to find the ultimate constitutional fact, whether the grand jury was overborne— is

the cold record of the grand jury proceedings. Specifically, we draw inferences from the

words [the] AUSA [name] used, the testimony of witnesses who appeared before the grand

jury, and the grand juror's questions." United States v. Sigma, 196 F.3d 1314 (11th Cir. 1999)

(p.53). See also Stirone v. United States, 361 U.S. 212 (1960) ("the very purpose of the

requirement that a man be indicted by a grand jury is to limit his jeopardy to offenses

charged by a group of his fellow citizens acting independently of either prosecuting attorney

or judge."); United States v. McKenzie, 678 F.2d 629, 631 (5th Cir.1982) (Holding that an

indictment may be dismissed "when prosecutorial misconduct amounts to overbearing the

will of the grand jury so that the indictment is, in effect, that of the prosecutor rather than the

grand jury").

　　Fattah asks that based on the reasonable suspicion that perjured testimony was

presented to the grand jury, and false statements in representations made to this Court by the

United States in the search warrant affidavit and Mr. Amato related filings that this Court

hold an evidentiary hearing on this issue to determine if the Court should dismiss the entire

Indictment or counts 1-7, 12 and 19-23 (See United States v. Basurto, 497 F.2d 781 (9th Cir.

1974) ("[w]e hold that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel— and, if the perjury may be material, also the grand jury— in order that appropriate action may be taken"). the Third Circuit said "[b]ut we expressly recognized that the use of a prophylactic rule of dismissal might be appropriate. In doing so, we noted that the federal courts have an institutional interest, independent of their concern for the rights of the particular defendant in preserving and protecting the appearance and the reality of fair practice before the grand jury, an interest which could justify the imposition of a prophylactic rule in a proper case."

The Third Circuit said that "[o]ur reading of [United States v.] Birdman [602 F.2d 547 (3d Cir. 1979)] is that dismissal of the indictment may be proper even where no actual prejudice has been shown, if there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends" Serubo, 604 F.2d 807 at 63. Fattah submits that this is such a case. Fattah submits this is not a case where "the challenged activity" is an "isolated incident unmotivated by sinister ends".

If the Court determines that a dismissal is appropriate, Fattah respectfully asks the Court to analyze the factors weighing a dismissal with prejudice, versus a dismissal without prejudice. As it relates to Mr. Amato, Mr. Braxton, Mr. McCarthy, Agent Haag and counts 5-7, 12 and 19-23, Fattah requests that the dismissal be with prejudice. Fattah submits that it is appropriate to do the same with regard to counts 1-4. Mr. Amato and Mr. Braxton should

not be given the opportunity to change their story once again. The United States should not

have an opportunity to fix their flagrant, willful, disregard for the truth, court procedures, due

process and the law. For the reasons discussed above, the Indictment should be dismissed.

    Respectfully submitted, this 10th day of December, 2014.

CHAKA FATTAH, JR., PRO SE
5783 Nassau Road
Philadelphia, PA 19131
Phone: 215-301-8125
Email: cfattahjr@gmail.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NO. 14-409 (HB) |
| | : | |
| CHAKA FATTAH, JR. | : | |

## **ORDER**

For good cause shown, the motion by Defendant Chaka Fattah, Jr., to quash the

Indictment with prejudice based upon prosecutorial misconduct is GRANTED. The

Indictment is hereby dismissed with prejudice. IT IS SO ORDERED.

Dated: _____, 20____

_____

HON. HARVEY BARTLE, III.
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,             :
                                      :
                                      :
                  v.                  :        CRIMINAL NO. 14-409 (HB)
                                      :
CHAKA FATTAH, JR.                     :

### CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that the foregoing MOTION TO QUASH THE
INDICTMENT WITH PREJUDICE FOR PERJURY BEFORE THE GRAND JURY AND
DUE TO REPEATED AND INTENTIONAL GOVERNMENT MISCONDUCT this 10th
day of December 2014, by filing the same via hand delivery to the Clerk of Court, which will
file the same with the Court's ECF system, which will send a notice of filing to counsel of
record:

Nina C. Spizer, Asst. Chief, Trial Unit, Federal Community Defender Office
James J. McHugh, Jr., Federal Community Defender Office
AUSA Paul L. Gray
Trial Attorney Eric L. Gibson

CHAKA FATTAH, JR., PRO SE
5783 Nassau Road
Philadelphia, PA 19131
Phone: 215-301-8125
Email: cfattahjr@gmail.com